# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**CRUZ VARGAS ALICEA**, *et al.*,
    Plaintiffs,

v.

**CONTINENTAL CASUALTY COMPANY**, *et al.*,
    Defendants.

Civil No. 15–1941 (PAD/BJM)

## OPINION AND ORDER

    Sandra Cruz Vargas Alicea, Brian Rafael Cruz Vargas, Steven José Cruz Vargas, and Michael Ruben Cruz Vargas (collectively "Cruz Vargas") moved for spoliation sanctions against Continental Casualty Company, Bio-Medical Applications of Ponce, Inc., John Doe, Inc. and ABC Insurance Company (collectively "BMA") based on the actions of nurse María Ramos La Torre (Ramos), Docket Nos. 65, 76, and BMA opposed. Docket No. 69. Spoliation is the "failure to preserve evidence that is relevant to pending or potential litigation." *Jimenez-Sanchez v. Caribbean Restaurants*, LLC, 483 F. Supp. 2d 140, 143 (D.P.R. 2007). To successfully show that its opponent engaged in spoliation, and thus that sanctions for spoliation are warranted, the party must make a threshold showing by "proffering evidence sufficient to show that the party who destroyed the document 'knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim.'" *Booker v. Massachusetts Dep't of Pub. Health*, 612 F.3d 34, 46 (1st Cir. 2010) (quoting *Testa v. Wal–Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)). The knowledge of the potential for litigation, though, refers to "institutional notice" such that the person who destroyed the document need not know of the litigation. *Testa*, 144 F.3d at 178 (institutional notice is the "the aggregate knowledge possessed by a party and its agents, servants and employees").

    If the party makes the "proper evidentiary foundation[,]" the court has considerable discretion in determining whether and which sanctions are warranted. *See Booker*, 612 F.3d at 45–46. Such sanctions may include, but are not limited to, an adverse inference instruction whereby

the "trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party." *Booker*, 612 F.3d at 45 (internal quotations omitted). In making its determination, the court takes into account any prejudice to the non-offending party, and whether bad faith motivated the spoliator's conduct. *See Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 447 (1st Cir. 1997). "In general, the instruction usually makes sense only where the evidence permits a finding of bad faith destruction[,]" but "unusual circumstances or even other policies might warrant exceptions. Consider, for example, negligent destruction of a particular piece of evidence likely to be exculpatory or routine destruction of a class of such evidence-neither variation being present here." *United States v. Laurent*, 607 F.3d 895, 902–03 (1st Cir. 2010); *see Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88, 95 (1st Cir. 1999) ("If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence."). Above all, an adverse inference instruction must "make sense in the context of the evidence." *Laurent*, 607 F.3d at 903.

   Cruz was a dialysis patient at BMA's dialysis clinic in Ponce. Docket No. 65–3 ("Ramos Dep.") at 7. At 6:40 p.m. on June 3, 2013, Ramos began her pretreatment evaluation of Cruz; he then began dialysis. *Id*. at 54–55. Soon after 9:57 p.m., Cruz finished dialysis. *Id*. at 19. As Ramos was throwing away "the pad and gauzes" used in Cruz's dialysis in the red garbage can next to Cruz's chair, Cruz stood and then fell to the floor in a fetal position with "seizure movements." *Id*. at 24–26, 45–46. Ramos and her co-workers checked his vital signs and tended to the wound on Cruz's head. *Id*. at 47. At 10:20 p.m., the supervisor notified a doctor who determined that Cruz should be taken to the hospital. *Id*. at 47. Cruz appeared oriented and alert. *Id*. at 48. At 11:10 p.m., emergency medical services arrived and took him to the emergency room at Damas Hospital. *Id*. at 48. A log entry, written that night or early the next morning by a BMA employee, summarized the event of the night as, "Maria Ramos allowed Hector Cruz to fall [or Hector Cruz fell on Maria

Ramos][1] and has a head wound and he convulsed. 911 was called and Dr. Santos. No relative could be contacted." Docket No. 65–5; Ramos Dep. at 40–41 (explaining that "the report of the event" was in "a log that we write everything in every day" by 8:00 a.m. the next day).

Ramos's next shift did not start until 2:00 p.m. the next day, but her supervisor called her in to work at 8:00 a.m. because her report of the fall was missing. Ramos Dep. at 40. She then wrote the two-page Adverse Event Form in the presence of her supervisor, Judith Echevarria, who had been the supervisor on duty the night before although she did not witness the fall itself. *Id*. at 41–42. To refresh her memory as she completed the form, Ramos referenced "a paper with some notes and with the vital signs" that she had created at the time of Cruz's fall; she did not have any other documents with her including the nursing note that she made the night before or Cruz's file. *Id*. at 48–49. Ramos created the paper with notes on it because "[a]s things were going on I was writing the note . . . I need to write down if I used saline, when the cannula was placed. . . . For example, the note would say, as an example, 'Fell at 10:10.' . . . I wrote down the time with the results while somebody is putting on the oxygen cannula, oxygen through nasal cannula." *Id*. at 50. After writing the Adverse Event Form and reading it over, Ramos left. *Id*. at 42–43. It is uncontested that Ramos threw away the paper with notes on it. Docket No. 69 at 10; Docket No. 65 at 5; Docket No. 76 at 5.

In the Adverse Event Form, Ramos wrote that before Cruz fell she told him "to wait for me, that he shouldn't walk by himself, in order for me to take him to get weighed." Ramos Dep. at 44. However, in the nursing notes that she had written the night before, Ramos did not indicate that she told Cruz not to walk alone; instead, she wrote, "I tell the patient to wait for me and when I turn. . . ." Ramos Dep. at 44–45. Ramos explained that there was a discrepancy because in the nursing note she made a "summary of the event" whereas in the Adverse Event Form she was more complete and more calm as she was writing. *Id*. at 45. The Adverse Event Form is almost two

---

[1] BMA contests Cruz's translation of the note, which stated "Hector Cruz se le callo a Maria Ramos" and provided its own translation, which states "Hector Cruz fell on Maria Ramos." Docket No. 82-1.

pages long whereas the nursing note is approximately one and one half pages long. *Id*. at 81–83, 89–90.

Cruz Vargas seeks sanctions, including an adverse inference instruction, because Ramos threw away the paper with notes on it that BMA knew could potentially be relevant to Cruz Vargas's claim when BMA knew that there was a potential for litigation.

In this case, it seems clear that there was a potential for litigation by the morning of June 4, 2013 when Ramos threw away the notes. At that point, Cruz had already fallen, and BMA had called 911 to get him to a hospital. Furthermore, BMA had printed out and had its employee, Ramos, fill out an Adverse Event Form. *Id*. at 42, 81. In addition, "the supervisor's report" had also already been completed. *Id*. at 40–41. This court has already found that a plaintiff filing an incident report and then being sent by the defendant to receive medical attention made "it clear that a future litigation was possible as a result of the incident." *Jimenez-Sanchez*, 483 F. Supp. 2d at 144 (no requirement that a particular person within the defendant corporation had received the incident report at the time of the spoliation). It does not seem like a stretch to then conclude that a party has knowledge of the potential for future litigation when the defendant's employees file multiple incident reports reporting the event in question and send the plaintiff to receive medical attention. While it is true that it may be clearer to the defendant that the plaintiff has an interest in pursuing the matter further when it is the plaintiff rather than the defendant who fills out the incident report, BMA's actions show that they anticipated possible litigation. Not only did BMA call Ramos in to work six hours before her shift started to have her fill out a report, indicating that BMA felt that a contemporaneous report of the event was important, but the report itself is titled an "Adverse Event Form." The term "adverse event" could be interpreted to refer to events that are adverse to BMA's interests. Moreover, the severity of Cruz's injuries, a seizure and a bleeding wound to the head that necessitated immediate medical attention and an ambulance ride to the emergency room, further support a finding that BMA knew that there was a potential for litigation at the time Ramos threw out her notes. *See Jimenez-Sanchez*, 483 F. Supp. 2d at 144 (potential for litigation when plaintiff lost the skin of her lips and then went to see a doctor); *see also Pelletier*

*v. Magnusson*, 195 F. Supp. 2d 214, 236 (D. Me. 2002) (A prison death made it "almost self-evident" that criminal or civil charges would ensue).

Waleska Olavarria, a BMA supervisor, at some point filled out a document titled "Notice of Potential Professional/General Liability Claim Form" with details of Cruz's fall, which according to the document's footer, must be sent to the "Corporate Health, Safety & Risk Management Department[;]" this was then stapled to the Adverse Event Form that Ramos completed. Ramos Dep. at 40, 80; Docket No. 65 at 4. However, as it is not clear that Olavarria filled out the form prior to Ramos' destruction of the document nor that the Adverse Event Form was originally meant to be included with it, Waleska's completion of the claim form should not be considered as evidence in this analysis. Separately, though, BMA's form acknowledges that "water damage, slip & falls, fires, damage to others property, injuries to visitors and injuries to patients" create, as the title of the form states, "potential professional and general liability." BMA even stated that BMA Ponce has a "polic[y]" that the Notice of Potential Professional/General Liability "must be completed for . . . injuries to patients." Docket No. 69 at 4 (quoting Docket No. 65–3 at 80). This only reinforces the finding that BMA had institutional knowledge that Cruz's fall could create potential liability through litigation.

As for the second prong of the test, Cruz Vargas has shown that BMA knew of the potential relevance of Ramos's notes to Cruz Vargas's claim. A document's "potential relevance to the plaintiff's claims" may be "apparent from the nature of the missing document itself." *Booker*, 612 F.3d at 47 (the fact that two of defendant's employees routinely deleted their emails, with no showing that the emails may have concerned her or that the employees knew that the documents could be relevant to her case, was insufficient to prove the deleted documents' relevance to the plaintiff's case). Here, Ramos took the notes at issue while treating Cruz immediately after his fall; the notes included "some notes," Cruz's vital signs, the time at which BMA employees performed different treatments, and possibly the time of the fall. *See* Ramos Dep. at 50; Docket No. 65 at 5 (Cruz Vargas maintains that the notes included a "contemporaneous account" of the incident, "the exact time of the incident" and "test results in the immediate aftermath"); Docket No. 69 at 7

(BMA agrees that the paper included "some notes" and "the vital signs" but contends that it did not include the time of the fall). As a contemporaneous documentation of Cruz's physical condition and the care that BMA's employees provided to him, the nature of the document makes its relevance to Cruz Vargas's claims against BMA clear. *See* Ramos Dep. at 50 (explaining that she was taking the notes as she cared for him and as her co-workers checked his vital signs and provided treatment). Furthermore, experts for both BMA and Cruz Vargas testified to the inherent importance of the notes to the case, which supports a finding that BMA should have known by their nature that they were at least potentially relevant. *See* Docket No. 65 at 10 (quoting BMA's medical expert, nephrologist Dr. José Cangiano, as stating that he "cannot consider that [the note is] not unimportant. I mean, I think it's important. . . . I mean, she wrote it."); Docket No. 69–1 at 168 (when Dr. Julio Benabe was asked "Do you have an opinion of whether that note contained important information to find out what really happened in this case?" he responded, "It certainly must have included important information because it would have either confirmed or corroborated what was provided as information in the documents that I read, or maybe not.").[2]

Furthermore, because Ramos made the notes contemporaneously to Cruz's treatment by BMA employees, there was little chance that the notes were influenced by Ramos's or BMA's potential concerns for their own liability. This makes the notes potentially even more valuable and relevant to Cruz Vargas's case than the Adverse Event Form that Ramos filled out in the presence of her supervisor the next morning, even if Ramos said that the Form included everything that had been in her notes. *See* Ramos Dep. at 52. At the very least, it shows that BMA knew that the notes were relevant because Ramos needed them to fill BMA's own document, the Adverse Event Form. On the other side of the spectrum, the notes could have, as Cruz Vargas's expert pointed out, revealed inconsistencies between Ramos's original understanding of the event as it occurred versus what she wrote the next morning on BMA's official form in the presence of her supervisor.

---

[2] BMA disingenuously quoted Benabe's statement: it omitted his qualifier of "or maybe not" and then argued that "there is no basis to conclude that paper, which was used to draft the Adverse Event Report, contained any additional information." Docket No. 69 at 8. This manipulation of the evidence is unpersuasive.

People's accounts of event tend to vary as time goes on; Ramos, for instance, stated in the Adverse Event Form that she had told Cruz "that he shouldn't walk by himself" and that he needed "to wait for me . . . in order for me to take him to get weighed" whereas her nursing note from the night before merely stated that she told Cruz "to wait for me" before turning to throw materials away in the garbage can." *Id*. at 44–45. There may have been similar discrepancies between the notes that Ramos threw away and the Adverse Event Form, but Cruz Vargas cannot know. Either way, BMA knew that Ramos's notes could be relevant to Cruz Vargas's claim. Consequently, they should not have been destroyed.

Additionally, although Cruz Vargas has presented no evidence that Ramos's disposal of the notes was done in bad faith, Cruz Vargas has shown that she was prejudiced by the disposal. It was the only truly contemporaneous account of how BMA employees reacted to his fall and what Cruz's medical condition was before he was taken to the hospital. It also included his vital signs immediately after he fell, and the changes in Cruz's blood pressure measurements are at the heart of Cruz Vargas's negligence claim against BMA. *See* Docket No. 83. Because Cruz Vargas has presented sufficient evidence to prove both elements of spoliation and shown that she was prejudiced by the spoliation, I find that an adverse inference sanction is warranted.

For the foregoing reasons, Cruz Vargas's motion for spoliation sanctions is **GRANTED**.[3] An adverse-inference instruction is warranted as the destruction of the note created by Ramos contemporary to her care of Cruz after he fell on the night of June 3, 2013.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 21st day of March 2018.

                                            *S/ Bruce J. McGiverin*
                                            BRUCE J. MCGIVERIN
                                            United States Magistrate Judge

---

[3] As this is a non-dispositive motion, I have the authority to enter a binding order. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 6 (1st Cir. 1999) (motion for sanctions is non-dispositive such that a magistrate judge has the authority to enter an order as long as the penalty imposed does not fully dispose of a claim or defense); *Augustyniak Ins. Grp., Inc. v. Astonish Results, L.P.*, No. CA 11-464S, 2013 WL 998770, at *6 (D.R.I. Mar. 13, 2013) ("Because motions for sanctions are not specifically excepted under 28 U.S.C. § 636(b)(1)(A) and, in general, are not of the same genre as the enumerated motions, they should be treated as nondispositive unless the motion seeks a sanction that fully disposes of a claim or defense.").