IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

SANDRA CRUZ VARGAS-ALICEA, et al.,

Plaintiffs,

v.

CONTINENTAL CASUALTY COMPANY, et al.,

Defendants.

CIVIL NO. 15-1941 (PAD)

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Plaintiffs are relatives of the deceased, who fell to the floor from a chair following a dialysis session in a BMA-Ponce clinic in Ponce, Puerto Rico, after which he was taken to a hospital, underwent brain surgery for a subdural hematoma, and passed away three (3) days later. They sued BMA-Ponce and its insurer, Continental Casualty Company, under Puerto Rico law for damages arising out of the incident (Docket No. 2).[1] Before the court are defendants' "Motion to Exclude Certain Testimony from Plaintiff's Expert Witness" (Docket No. 150); "Motion In Limine to Preclude Certain Statements from Plaintiffs, Plaintiffs' Counsel, and Plaintiffs' Witnesses" (Docket No. 151), and "Motion In Limine to Exclude Photographs" (Docket No. 152). Plaintiffs opposed the motions (Docket Nos. 154 and 160).

The court thoroughly examined the parties' submissions and supporting authorities in light of the record and heard extensive arguments on the issues raised (Docket No. 167 at p. 2). For the reasons explained below, the motion to exclude testimony (Docket No. 150) is GRANTED, the

---

[1] For background, see, Opinion and Order (Docket No. 39)(denying defendants' motion to dismiss for failure to state a claim), Report and Recommendation ("R&R")(recommending that defendants' motion for summary judgment be denied)(Docket No. 104), and Memorandum and Order (adopting R&R)(Docket No. 137).

motion to preclude statements (Docket No. 151) is GRANTED IN PART and the motion to exclude photographs (Docket No. 152) is DENIED WITHOUT PREJUDICE.

## I. EXCLUSION OF TESTIMONY FROM PLAINTIFF'S EXPERT WITNESS

Plaintiffs retained Dr. Julio Benabe as an expert witness. Dr. Benabe prepared a report and was deposed. Defendants assert Dr. Benabe's testimony should be limited to the matters contained in the report, and that any testimony regarding opinions or subjects not included or mentioned in his expert report, even if discussed during the deposition, should be excluded from trial as a violation of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure (Docket No. 150 at p. 1). To this end, they state Dr. Benabe should not be allowed to testify as an expert on the applicable standard of care, the fall prevention measures that plaintiffs allege BMA-Ponce should have taken, a paper that the nurse attending the deceased discarded on June 3, 2013, the treatment the deceased received in the hospital, the cause of death and its alleged causal relation to the fall. Id.

### A. Standard of Care.

To prevail in the case, plaintiffs bear the burden of establishing by a preponderance of the evidence: (1) the duty that as a health-care facility, BMA-Ponce owed to the deceased; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm. See, Rivera v. Turabo Medical Center Partnership, 415 F.3d 162, 167 (1st Cir. 2005)(identifying elements of action). Along this line, Puerto Rico holds health care professionals to a national standard of care. See, Cortes-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 190 (1st Cir. 1997)(stating standard). Given that medical knowledge is critical to demonstrating the parameters of a health-care provider's duty, the minimum standard of acceptable care is almost always a matter of informed opinion. See, Rolón-Alvarado v. San Juan, 1 F.3d 74, 78 (1st Cir. 1993)(so recognizing).

Dr. Benabe's report fails to identify the national standard of care, stating instead what BMA-Ponce should have done (Docket No. 53-8 at p. 4). The mere fact that an expert might have selected a particular approach or method of treatment does not, without more, establish that a different approach or method, even if unsuccessful, fell short of the duty owed. See, Rolón-Alvarado, 1 F.3d at 78 (articulating proposition); Meek v. Shepard, 484 A.2d 579, 581 (D.C. 1984)(rejecting testimony of expert who stated what he would do under similar circumstances rather than describe national standard of care by which the defendant's actions could be measured). Professional standards require normative judgments, not merely proof that a better way to treat a particular patient could have been devised. See, Rolón-Alvarado, 1 F.3d at 78 (so noting).

Within this framework, the expert must establish that the standard of care he identifies or refers to is followed nationally through: (1) discussion of the described course of treatment among practitioners outside of Puerto Rico such as at conventions, meetings or seminars; (2) presentation of relevant data like published protocols and standards; or (3) reliance on peer-reviewed literature (i.e. journals, textbooks, and treatises). See, Porter v. McHug, 850 F.Supp.2d 264, 268 (D.D.C. 2012)(discussing topic); Hawes v. Chua, 769 A.2d 797, 806-808 (D.C. 2001)(examining proposition and collecting cases). Dr. Benabe's report is silent on these parameters.[2] And while his report mentions publications in a footnote, it does not relate the content of those publications to whether the relevant course of treatment is followed nationally as required by law. See, Baker v. Chevron USA, 680 F.Supp.2d 865, 878 (S.D. Ohio 2010)(concluding that expert report was

---

[2] Allusion to *primum non nocere*, or "first, do no harm," does not establish a sufficient standard of care. See, Casillas-Sánchez v. Ryder Memorial Hosp., 14 F.Supp.2d 22, 25 & n.2 (D. P. R. 2014)(so recognizing). That principle relays nothing more than every physician's Hypocratic Oath, "which, as we all know, is the foundation of medical ethics." Id. (citations omitted). But it is not, standing alone, an established standard of care to sustain a tort action under Puerto Rico law. Id.

inadequate in part because expert made no effort to connect the medical literature to expert's opinions).[3]

### B. Fall Prevention Measures.

Plaintiffs allege that BMA-Ponce failed to take sufficient fall prevention measures (Docket No. 25 at pp. 5-6). Defendants contend Dr. Benabe's report does not explain what those measures were or how they reflect a national standard of care (Docket No.150 at pp. 6-7). The report states the deceased should not have been allowed to stand and walk without assistance from dialysis personnel until it was assured and documented that his blood pressures were stable and he was able to ambulate without assistance (Docket No. 53-8 at p. 4). Even though the statement is sufficiently precise, it does not link the expert's opinion to a national standard of care. An expert's educational and professional background is insufficient to demonstrate that he is familiar with that

---

[3] See also, Strickland v. Pinder, 899 A.2d 770, 774 (D.C. 2006)(expert's testimony insufficient to establish national standard of care, as he stated "that his opinion was what other similarly trained doctors would have done under similar circumstances or that it was the standard of care [of] what doctors do in hospitals around the country" without linking the testimony to any certification process, current literature, conference or discussion with other knowledgeable professionals outside of the District of Columbia, where the events occurred). Compare with, Snyder v. George Wash. Univ., 890 A.2d 237, 246 (D.C. 2006)(expert's reference to conferences with College of Surgeons, surgeon certification commissions, relevant scholarly literature that expert made an effort to keep current with, hospital staff and national surgical society meetings, as sources sufficient to establish that expert's testimony was not based on a personal opinion but on a national standard), and Cárdenas v. Muangman, 998 A.2d 303, 310, 311 (D.C. 2010)(expert's testimony met the minimum requirements to establish national standard where he explained that his opinion was based on his familiarity with medical literature, national in scope, including *Obstetrics & Gynecology*, the official publication of the American College of Obstetricians and Gynecologists (ACOG), the *American Journal of Obstetrics and Gynecology* and various textbooks containing sections on second trimester abortions; speakers from over the country, including California, Michigan and New York who came to grand rounds at the Medical College of Virginia, where the expert was on the faculty; attendance at national meetings, including repeated attendance at the annual ACOG meeting, and while attending these meetings, he had discussed second trimester abortions with other physicians from various areas of the country).

standard.[4] See, Strickland, 899 A.2d at 774 (addressing expert opinion's insufficiency).[5]

### C. Other Omissions

Defendants point out additional omissions on Dr. Benabe's report. First, after the decedent fell, Nurse Ramos wrote down some notes about the deceased's post-fall condition, which she later included in a written statement. Once she copied the information in her written statement, she discarded the paper she wrote the notes on. But Dr. Benabe's report does not mention or discuss the discarded paper (Docket No. 150 at p. 8). Second, the report lacks an opinion as to the propriety of treatment received by the deceased in the hospital, even though it includes an overview of what happened to him after he was taken from BMA-Ponce's facility to the hospital (Docket No. 53-8 at p. 3). Third, the report does not include an opinion regarding the cause of death or a link between the deceased's fall and his passing (Docket No. 53-8 at pp. 3-4).

---

[4] During the deposition Dr. Benabe was asked if as an educator at the Puerto Rico Medical Center he had taught patients about safety precautions at medical facilities, and he responded "no" (Docket No. 74-4 at p. 32). As for publications, he was asked how many of the publications he listed are related to dialysis patients. Id. He answered "I don't know. I don't know. I would have to go over them and see which ones are. There's a chapter that has to do with chronic kidney disease, particularly complications associated with patients on dialysis. But as far as I recall, that's the only one. My main area of interest and involvement has been hypertension, progression of kidney disease, electrolyte disorders. That's what you will see reflected here in the … Bibliography." Id. To the question how many of the publications are related to safety precautions at health care facilities, he said, "Directly? None. Indirectly, what common sense should dictate, once you know what's happening in the patients. Id. at 33-34. The testimony is inadequate to show national standard of care.

[5] Nurse María Ramos was with the decedent when he fell. As for the standard of care owed by nurses, the Puerto Rico Supreme Court has held that a nurse must use a degree of reasonable care to avoid causing unnecessary harm to the patient, such degree of care being equal to the degree of care exercised by other nurses in the locality or similar localities. See, Pages-Ramírez v. Hospital Español Auxilio Mutuo, 547 F.Supp.2d 141, 149 (D.P.R. 2008)(identifying standard of care)(citing Blas Toledo v. Hospital Nuestra Señora de la Guadalupe, 146 D.P.R. 267, 307 (1998)). Dr. Benabe's report does not address this standard. Compare with, Sanders v. U.S., 572 F.Supp.2d 194, 197-198 (D.D.C. 2008)(reliance by experts in fields of nursing-home management and nursing on the Joint Commission for the Accreditation of Health Care Organization's national standards for nursing care that an organization like defendant's had to follow in order to be accredited considered sufficient to establish national standard of care applicable to the case) as opposed to Toy v. District of Columbia, 549 A.2d 1, 7-8 (D.C. 1988)(noting that plaintiff's expert in a suicide case did not provide any basis for his opinion that national standards required the defendant to have oxygen and other emergency equipment available at its Traffic Division; he did not refer to written standards or authorities as support for his opinion, and albeit he named one instance of a police department with emergency equipment, he failed to state how many police departments had this type of emergency equipment to properly establish a national standard), and District of Columbia v. Moreno, 647 A.2d 396, 400 (D.C. 1994)(expert's opinion insufficient due to failure to provide information regarding comparable facilities).

**D. Report's Deficiencies**

Rule 26(a)(2)(B) requires expert witnesses to provide a written report that, among other things, contains: (1) a complete statement of all opinions the witness will express and the basis and reasons for them; and (2) the facts or data the witness considered in forming the opinion(s). The report "must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial," and "sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve judicial resources." R.C. Olmstead v. CU Interface, 606 F.3d 262, 271 (6th Cir. 2010); Sylla-Sawdon v. Uniroyal, 47 F.R.D. 277, 284 (8th Cir.), *cert. denied* 516 U.S. 822 (1995)(examining topic). Dr. Benabe's report falls short in: (1) not having (i) identified the national standard of care by which to measure BMA-Ponce's conduct: (ii) linked what it characterizes as fall prevention measures to that standard; and (2) omitting discussion of the paper that Nurse Ramos discarded.[6]

Plaintiffs argue there is nothing wrong with Dr. Benabe's report because it did not have to use "magic words;" reports do not have to replicate every word that the expert might say on the stand; and experts may supplement, elaborate upon, and explain their reports in oral testimony (Docket No.160 at pp. 1-2). This is true, as far as it goes.[7] However, it does not justify bypassing the requirements of Rule 26. Expert reports delimit what the expert may say during trial. See,

---

[6] In his deposition, Dr. Benabe was asked whether his report contained all his opinions in relation to this case (Docket No. 74-4 at p. 34). He answered: "I guess so." Id. The report lacks opinions on the adequacy of treatment in the hospital and the cause of death, although in the deposition Dr. Benabe stated he was not offering opinions on the hospital treatment. Id. at p. 115. Likewise, he said he did not state in his report that the deceased passed away due to his injuries from the fall, because he thought "it's obvious." Id. at p. 126.

[7] See, Gay v. Stonebridge Life Ins. Co., 680 F.3d 58, 63-64 (1st Cir. 2011)(rejecting plaintiff's argument that expert witness exceeded the bounds of his report when he testified that the deceased's skull fracture was not a major cause of her death, as report stated that the deceased suffered a cerebral hemorrhage which led to unconsciousness and that this event led to a fall with head injury, hence while the expert used different words at trial, his testimony therein was a reasonable elaboration of the opinion disclosed in the report that the amount of bleeding described seemed out of proportion to that which would be expected on the basis of trauma alone).

Meyer v. Bodum, 715 F.Supp.2d 827, 830 (N.D. Ill. 2010)("Both the language and the structure of the operative rules call for opinion witnesses' reports to be self-contained"); Medtronic Inc. v. Guidant Corp., 2004 WL 5501181, *1 (D.Del. Oct. 6, 2004)(granting motion *in limine* to confine expert witness' testimony to opinions expressed in expert's report). Therefore, Dr. Benabe's report lacks a complete statement of all opinions the expert witness would be expressing at trial and the basis and reasons for them in violation of Rule 26(a)(2)(B) and (e)(2).[8]

### E. Consequence

Rule 37(c)(1) operates as an enforcement mechanism for Rule 26(a)(2), providing that when a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, hearing, or at a trial, unless the failure was substantially justified or is harmless. See, Peña-Crespo v. Puerto Rico, 408 F.3d 10, 12-13 (1st Cir. 2005)(sustaining decision to prohibit expert witness from testifying at trial in part due to failure to provide a report that satisfied the requirements of Rule 26(a)(2)(B), as exclusion is a standard sanction for violation of duty to disclose under Rule 26). The burden of establishing that a failure to disclose was substantially justified or harmless rests on the potentially sanctioned party. See, Wilson v. Bradlees of New England, 250 F.3d 10, 21 (1st Cir. 2001)(applying formulation).

Plaintiffs offer no justification, much less substantial justification for having produced a report without opinions sufficient to gain access to trial. Instead, they essentially argue that any

---

[8] Plaintiffs argue this case is no different than Casillas-Sánchez, 14 F.Supp.3d at 24, where the district court rejected the defendants' claim that plaintiffs' expert did not testify as to the proper standard of care applicable to the codefendant physician's treatment of the deceased (Docket No. 160 at pp, 4-5). That case does not help plaintiffs, as the defendants in Casillas-Sánchez did not challenge the extent to which the standard that plaintiffs' expert witness testified about reflected a national standard. Correspondingly, the district court did not have occasion to analyze the problem by examining sources of information that would confirm that the expert had relied upon a national standard of care.

omission is harmless (Docket No. 160 at pp. 5, 7). They state defendants had the opportunity to scrutinize Dr. Benabe's report and extensively depose him, and should not be heard to complain about the completeness of this expert disclosures because they chose not to use their full Rule 30(d)(1) hours; could have left Dr. Benabe's deposition open and continued it on a later date but did not seek to do so; and never requested an extension of discovery. Id.

In general, Rule 26(a)(2) does not allow parties to cure deficient expert reports through later deposition testimony. See, Ciomer v. Coop. Plus, 527 F.3d 635, 642 (7th Cir. 2008) (articulating principle). The purpose of Rule 26(a)(2) is to provide notice to opposing counsel – before the deposition – as to what the expert witness will testify, and this purpose would be undermined if parties were allowed to cure deficient reports with later deposition testimony. Id. Allowing parties to cure a deficient report with later depositions would further undermine a primary goal of Rule 26(a)(2): "to shorten or decrease the need for expert depositions." Id. The parties need for expert depositions would increase if they could use deposition testimony to provide information that should have been initially included in the Rule 26(a)(2) report. Id.

In line with these principles, courts may confine expert witnesses to testifying about the opinions that are contained within their original report. See, Ciomer, 527 F.3d at 642 (rejecting attempt to cure deficiencies in report by filing in court a transcript of the expert's deposition); Scholl v. Pateder, 2011 WL 3684779, *3 (D.Colo. Aug. 22, 2011)(excluding from trial opinions disclosed during deposition but not previously included in the expert's report); Honeywell Intern., Inc. v. Universal Avionics, 289 F.Supp.2d 493, 500 (D.Del. 2003)(excluding testimony about doctrine of equivalents because it was not contained in expert report).

All things considered, exclusion is apt in this case taking into account the persuasive value of the authorities cited above in light of the record at hand. As indicated, plaintiffs could not justify

the expert's report's deficiencies. Defendants have complained that the report's omissions interfered with their interest in being adequately prepared to confront the expert during the deposition with the information he omitted from his report. Plaintiffs' opposition to defendants' motion *in limine* does not expressly claim they would be harmed by granting of defendants' request. In the court-approved pretrial conference report they reserved the right to call defendants' expert witness as their witness. To reopen discovery at this juncture would unnecessarily interfere with the court's case management. In consequence, Dr. Benabe is precluded from providing expert opinion during trial on the standard of care, fall prevention measures, the paper that Nurse Ramos discarded, the propriety of treatment in the hospital, and the cause of death. See, Chapman v. Labone, 460 F.Supp.2d 989, 998 (S.D. Iowa 2006)(striking paragraphs in expert's affidavit because they expressed an opinion not contained in expert's report); Moore North America v. Poser Business Forms, 2001 WL 253117, *7 (D. Del. March 8, 2001)(limiting expert witnesses' testimony at trial to the information contained in their expert reports).

## II. MOTION TO PRECLUDE STATEMENTS

Defendants request an order to preclude plaintiffs from mentioning to the jury: (1) the fact that BMA-Ponce is insured or may have insurance coverage regarding the liability claims in this case; (2) to place itself in plaintiffs' shoes ("Golden Rule"); (3) the length of time required to bring this matter to trial; (4) that plaintiffs must pay attorney's fees and expenses out of any award or verdict; (5) defendants' corporate wealth and financial disparities between the parties (Docket No. 151 at pp. 1-3). Plaintiffs represent they do not anticipate telling the jury anything about the length of time this case has been litigated, what is their fee arrangements with counsel, or that the jury should find against the defendants because they are large corporations (Docket No. 154 at pp. 4-5). They argue that any ruling on Golden Rule should be postponed until trial, and resolved if

needed at that juncture, and state the existence of an insurance carrier cannot be withheld from the jury because there is a direct-action statute in Puerto Rico. Id. at pp. 2-4.

### A. Golden Rule

A "Golden Rule" argument asks jurors to place themselves in the position of a party. See, Grandfield v. CSX, 597 F.3d 474, 491 (1st Cir. 2010)(addressing topic).[9] The argument has been universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. Id. As such, it shall not be used here.[10]

### B. Insurance

Rule 411 of the Federal Rules of Evidence provides that the fact that a person was or was not insured against liability is inadmissible to establish negligence or wrongful conduct by the individual.[11] It is designed to minimize unfair prejudice related to the consideration of liability insurance for, on the one hand, the probative value of liability insurance is exceedingly low concerning issues of liability, and on the other hand, the risks of prejudice are extremely high. See, Stephen A. Saltzburg, Michael M. Martin & Daniel Capra, 2 Federal Rules of Evidence Manual

---

[9] The term "Golden Rule" finds its origin in the New Testament. See, Jacob A. Stein, Closing Arguments (2018-2019 ed.), § 1.83 & n.1 (so noting); Thomas Morawetz, "Efficiency, Morality, and Rights: The Significance of 'Cleaning Up'," 10 Harv. J. L. & Public Policy 433, 441 & n.31 (1987)(same). In this connection, see, Luke 6:31 ("And as ye would that men should do to you, do ye also to them likewise") and Mathew 7:12 ("Therefore all things whatsoever ye would that men should do to you, do ye even so to them: for this is the law and the prophets").

[10] Delaying a ruling on this issue would not promote the objectives set in Rule 1 of the Federal Rules of Civil Procedure. By contrast, a ruling now serves to better assist the parties prepare for trial.

[11] Nevertheless, it permits evidence of insurance where it is offered to prove some other fact, such as agency, ownership or control, or to establish the bias or prejudice of a witness, subject to balancing under Rule 403 of the Federal Rules of Evidence. See, Pinkham v. Burgess, 933 F.2d 1066, 1072 (1st Cir. 1991)("In determining whether to admit or exclude evidence about insurance that is offered for a purpose other than to prove a party acted negligently, the district court must apply the principles of Fed.R.Evid. 403"); Granberry v. O'Barr, 866 F.2d 112, 114 (5th Cir. 1988) (sustaining ban on cross-examining eyewitness regarding his employment with defendant's liability carrier as trial court balanced relevance under Rule 411 and unfair prejudice under Rule 403).

(2015), Sec. 411.02, pp. 411-2 to 411-3 (discussing topic); Michael H. Graham, 3 Handbook of Federal Evidence (8th Ed.), Sec. 411.1, p. 1037 (same).[12] In addition, it promotes a general public policy of favoring insurance coverage, as both insurers and insured are encouraged to enter into contracts of insurance with the implied promise that they will not, as a result of their forethought, be subject to an inference of carelessness. See, 2 Weinstein's Federal Evidence; Sec. 411.03 (1), p. 411-5 (examining provision). In all, it reflects the almost uniform historical practice of Federal and State courts. Id. at Sec. 411.03 (1), p. 411-4 (so noting); Briscoe v. Stewart, 423 So.2d 1198, 1201 (La. App. 4th Cir. 1982)("the majority of … States have decided that evidence which informs the jury that the defendant is insured shall be generally inadmissible"). Thus, its text and its underlying policy strongly counsel against mentioning the fact of insurance to the jury.

However, Puerto Rico is a direct-action jurisdiction.[13] Section 20.030(1) of the Puerto Rico Insurance Code provides that "any individual sustaining damages and losses shall have, at his option, a direct action against the insurer under the terms and limitations of the policy, which action he may exercise against the insurer only or against the insurer and the insured jointly." P.R. Laws Ann. tit. 26 § 2003(1). Similarly, Section 20.010 states that the insurer issuing a policy insuring any person against loss or damage through legal liability "shall become absolutely liable whenever a loss covered by the policy occurs, and payment of such loss by the insurer to the extent of the liability therefor under the policy shall not depend upon payment by the insured of or upon any final judgment against him arising out of such occurrence." P.R. Laws Ann. tit. 26 § 2001.

---

[12] See also, Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 758 (3d Cir. 1976)("Knowledge that a party is insured may … affect a verdict if the jury knows that some of the loss has been paid by insurance or that it would satisfy a judgment against a defendant"); Tavares v. Michigan Fishing, Inc., 937 F.Supp. 84, 85-86 (D. Mass. 1996)(reference to insurance during trial is unduly prejudicial and contrary to the public policy against punishing those who insure against risk).

[13] In a direct-action jurisdiction, an injured person is permitted to sue an insurer directly and usually is also permitted to join the insured. See, Robert E. Keeton, Alan I. Widiss and James M. Fisher, Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices, West Academic Publishing, p. 849 (2d Ed. 2017)(addressing issue).

Pursuant to the Puerto Rico Insurance Law of 1921, as amended by Law No. 19 of 1929, the insurer could be sued after the plaintiff had obtained a favorable judgment against the insured or by joining the insurer and insured in the same complaint. See, United States Casualty Co. v. Corte, 66 P.P.R. 884 (1947)(so noting). Law No. 60 of April 17, 1952, amended the Insurance Law to authorize filing of a complaint against the insurer without need to include the insured. See, Pérez v. Maryland Casualty Company, 78 P.P.R. 453 (1955)(examining amendment). The Puerto Rico Supreme Court explained that the amendment was procedural in nature and did not create an independent cause of action against the insurer, that is, a separate action against the insurer different than the action against the insured. Id. at 480-482.

In 1957, the Puerto Rico Legislature enacted the Insurance Code, Law No. 77 of June 19, 1957, P.R. Laws Ann. tit. 26 § 201 *et seq.*, authorizing, by way of Sections 20.010 and 20.030, a direct, substantive action against the insurer, independent of the action against the insured. See, García v. Northern Insurance Co., 92 P.P.R. 236 (1965)(concluding that Sections 20.100 and 20.030 are substantive); Trigo v. The Travelers Insurance Co., 91 P.P.R. 843, 849-852 (1965) (same); Rodríguez-Díaz v. Sierra Martínez, 717 F.Supp. 27, 31 (D.P.R. 1989)(noting that these provisions "create a separate and distinct substantive cause of action against insurers").[14]

---

[14] As indicated earlier, an insurer's direct liability "is not contingent on payment by the insured or on the issuance of final judgment." W Holding Co., Inc. v. Chartis Ins. Company Puerto Rico, 845 F.Supp.2d 422, 427 (D. P. R. 2012). Damages sought in suits brought under the direct action statute, however, "are the same, are based on the same factual situation and stem from the fault or negligence of the insured." Fraticelli v. St. Paul & Marine Ins. Co., 375 F.2d 186, 188 (1st Cir. 1967). Consequently, in Lind Rodríguez v. Commonwealth, 112 D.P.R. 67, 69-70 (1982), the Puerto Rico Supreme Court expressly held that, while the existence of the cause of action against the insurer is independent of that against the insured, there must be a cause of action against the insured. Thus, if there is no cause of action against the insured, the insurer is not liable. Id. at 70. Along the same line, see, Ruiz-Rodríguez v. Litton Industries Leasing Corp., 574 F.2d 44, 45-46 (1st Cir. 1978)("… [W]e have characterized the direct action statute as creating 'a separate cause of action' against the insurer … But the cause of action merely permits an injured party to maintain directly against the insurer the same claim it could have pursued against the insured. It has never been suggested that under the direct action statute the insurer's liability somehow becomes independent of its contractual obligations." On the topic of direct action under the Puerto Rico Insurance Code, see, Rolando Cruz, Derecho de Seguros, 262-267 (Publicaciones JTS, 1999), pp. 262-267.

The Puerto Rico Supreme Court's characterization of these sections as substantive instead of procedural is binding on this court, and must be honored on the authority of Erie Railroad Co. v. Tomkins, 304 U.S. 64 (1938). See, Bosco v. Firemen's Fund Ins. Co., 171 F.Supp. 432, 433-434 (D.P.R. 1959)(acknowledging and applying proposition).[15] So viewing the action, its interplay with Rule 411 of the Federal Rules of Evidence does not prohibit reference to the existence of insurance during trial, at least where, as in the present case, the allegedly injured party has sued the insurer directly. See, Wright & Graham, Federal Practice and Procedure: Evidence §5364, pp. 453-454 (examining relationship between Rule 411 and state direct-action statutes).

The Legislature's policy choice of creating a direct action addresses both the relevance of insurance and its prejudicial effect, two of the concerns underlying Rule 411. At bottom, when the Legislature creates the action it effectively determines that knowledge of insurance is relevant and not prejudicial to the insured or its insurance carrier. See, Blanke v. Alexander, 152 F.3d 1224, 1230-1231 (10th Cir. 1998)(assessing issue); Susan A. Row, "Admissibility of Insurance Policy Limits," 45 La.L. Rev. 1229, 1311 (1985)("…[T]he evidentiary problems addressed by Rule 411 regarding the admissibility of the fact of insurance are avoided by the Louisiana Direct Action Statute…"); New Amsterdam Casualty Co. v. Harrington, 274 F.2d 323, 325-326 (5th Cir. 1960)(reference to insurance not improper in suit based on the Louisiana Direct Act Statute; under that statute, the insurer is named as a defendant and is a party litigant in every sense of the word).[16] That said, Rule 411 is still operative "to prevent arguments that would suggest to the jury that the

---

[15] In spite of the general applicability of the Federal Rules of Evidence to diversity actions, it is well recognized that Congress did not intend the rules to preempt substantive state rules, for those rules serve substantive state policies. See, McInnis v. A.M.F., 765 F.2d 240, 245 (1st Cir. 1985)(analyzing relationship between Federal Rules of Evidence and state rules).

[16] The Puerto Rico Supreme Court has cited Louisiana authorities interpreting that state's direct action statute in construing the Puerto Rican analogue. See, Ruiz Rodríguez v. Litton Industries, 574 F.2d 44, 46 (1st Cir. 1978)(so noting). To this end, see, Landol v. Colón, 78 P.R.R. 572, 574 (1955); Northern Assurance Co, 92 P.R.R. at 240-246; The Travelers Insurance Co., 91 P.R.R. at 848-850.

existence of insurance can be made the basis of an inference of negligence." Wright & Graham, *supra*, § 5364 at p. 454.

With this background, given that the insurer has been directly sued in a case subject to Puerto Rico law, the jury may be informed that BMA-Ponce is insured by Continental Casualty Company. Correspondingly, the jury would be instructed that the fact of insurance is not admissible, hence not to be considered, to determine if plaintiffs satisfied their burden of proving that BMA-Ponce is liable.

### III. EXCLUSION OF PHOTOGRAPHS

Defendants state that in the Joint Pretrial Conference Report, plaintiffs announced they purport to use as evidence in the trial two (2) photos of the deceased in bed at the hospital (Docket No. 152 at p. 1). They argue the photos should be excluded given that: (1) the defendants have never seen them and have no information regarding who took them, when they were taken, or what they are meant to purportedly describe; and (2) the probative value, if any, of the photos is substantially outweighed by danger of unfair prejudice, for they would elicit compassion and sympathy rather than illuminating the jury on the facts of the case; and plaintiffs can present witness testimony and hospital records to adequately establish the deceased's condition without having to confront the jury with photographs. Id. at pp. 1-2.

Plaintiffs do not challenge defendants' request but claim they should be allowed to use "visual aids" of subdural hematoma, craniotomy, and endotracheal intubati to illustrate the decedent's damages, arguing that visual aids are not substantive evidence and should not be treated as exhibits (Docket No. 160 at pp. 14-15). They do not elaborate upon the distinction between

visual aids and substantive evidence.[17]

Notwithstanding the asserted distinction, during the pretrial conference plaintiffs expressed they would not be using a number of exhibits previously announced in their portion of the Pretrial Conference Report, including proposed exhibits 51 (*visual aid* of subdural hematoma), 52 (*visual aid* of craniotomy) and 53 (*visual aid* of endotracheal intubation) –see, Minutes of Proceedings: Pretrial/Settlement Conference (Docket No. 155 at p. 3)– a decision contrary to the position they have taken in response to defendants' request. What is more, to date they have not described what type of visual aids they intend to use or provided defendants with a copy of those aids for examination and opportunity to object prior to trial.

With that in mind, by April 5, 2019, plaintiffs shall share with defendants the visual aids they intend to use and through what testimony those visual aids would be presented to the jury. Defendants will inform plaintiffs of any objections and the grounds therefor by April 12, 2019. Should objections be raised and not resolved, defendants shall present a motion *in limine* not later than April 17, 2019, with a copy of the challenged visual aids. In that case, a motion in opposition would be due on April 24, 2019.

### IV. CONCLUSION

For the reasons stated, the "Motion to Exclude Certain Testimony from Plaintiff's Expert Witness" (Docket No. 150) is GRANTED; the "Motion In Limine to Preclude Certain Statements

---

[17] Demonstrative aids are used to illustrate other admitted evidence. See, 2 McCormick on Evidence, 7th Ed (2013), Sec. 2.14, pp. 18-19 (discussing subject). In theory, they have no independent probative value for determining the substantive issues in the case. Id .at p. 19. Their relevance is explained by the assistance they give to the trier in understanding other real, testimonial and documentary evidence. Id. There is some diversity of judicial opinion concerning their precise evidentiary status. Id. at p. 20. Some jurisdictions treat them as admissible exhibits which may be viewed by the jury during deliberations. Id. Other courts treat them differently, either admitting them for demonstrative purposes only or refusing to admit them at all as exhibits. Id. These courts then differ on whether to allow them into the jury rooms during deliberations. Id. at p. 21.

from Plaintiffs, Plaintiffs' Counsel, and Plaintiffs' Witnesses" (Docket No. 151) is GRANTED IN PART, and the "Motion In Limine to Exclude Photographs" (Docket No. 152) is DENIED WITHOUT PREJUDICE subject to the procedure set forth above.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2019.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
U.S. DISTRICT JUDGE
