## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA CRUZ VARGAS-ALICEA, <u>et al.</u>,

      Plaintiffs,

        v.

CONTINENTAL CASUALTY COMPANY, <u>et al.</u>,

      Defendants.

CIVIL NO. 15-1941 (PAD)

### OPINION AND ORDER

Delgado-Hernández, District Judge.

Before the court is plaintiffs' "Motion for Partial Reconsideration of DKT. 201" (Docket No. 219), which defendants opposed (Docket No. 235). After careful review, the motion is granted in part, to allow plaintiffs' expert witness to provide opinion testimony as to standard of care, the extent to which BMA-Ponce deviated from that standard, the alleged causal relation between the deviation and decedent's passing and a note that a BMA-Ponce nurse discarded after the incident that culminated in this action. He is precluded from proffering opinions about the care that the deceased received in the hospital.

### I.  BACKGROUND

On June 3, 2013, Mr. Héctor Cruz fell to the floor following a dialysis session in a BMA-Ponce clinic in Ponce, Puerto Rico, after which he was taken to a hospital, underwent brain surgery for a subdural hematoma, and passed away three (3) days later.[1]  Plaintiffs – Mr. Cruz' former wife

---

[1] On June 5, 2013, hospital personnel declared that the deceased had suffered "brain death."  <u>See</u>, "Joint Pretrial Conference Report," (Docket No. 145), p. 38, ¶ 19.  He was removed from life support and passed away on June 6, 2013.  <u>Id.</u> at p. 11; "Second Modified Second Amended Complaint" (Docket No. 25), p. 4, ¶ 21; "Defendants' Answer to the Second Modified Second Amended Complaint" (Docket No. 41), p. 4, ¶ 21; "ESRD Death Notification, End Stage Disease Medical Information System" (Docket No. 84-1, pp. 1, 3).

and his three sons (Docket No. 145, p. 10) – sued BMA-Ponce and its insurer, Continental Casualty

Company, under Puerto Rico law for damages arising out of the incident (Docket No. 1).

Defendants filed a "Motion to Exclude Certain Testimony from Plaintiff's Expert Witness"

(Docket No. 150), which plaintiffs opposed (Docket No. 154).[2]  The court granted the motion

("Initial Ruling"), precluding plaintiffs' expert from providing expert opinion during trial on the

standard of care, fall prevention measures, the propriety of treatment in the hospital, a paper that a

nurse discarded, and the cause of death.  Plaintiffs request reconsideration (Docket No. 219).

## II.    DISCUSSION

### A.  Context

Plaintiffs retained Dr. Julio Benabe as an expert witness.  Dr. Benabe prepared a report and

was deposed.  Defendants contend that Dr. Benabe's testimony should be limited to the matters

contained in the report, and that any testimony regarding opinions or subjects not included or

mentioned in his expert report, even if discussed during the deposition, should be excluded from

trial (Docket No. 150 at p. 1).

### B.  Original Ruling's Rationale

In the Initial Ruling, the court described the basic framework within which the parties'

contentions must be evaluated, namely: (1) the legal parameters governing liability; and (2) the

---

[2] In opposing the motion, plaintiffs argued that the motion was late and that defendants therefore waived any complaints about the adequacy of Dr. Benabe's report because they filed the motion after the discovery cutoff date (Docket No. 160, p. 5).  In the request for reconsideration, they raise the same argument (Docket No. 219, pp. 7-8). The court has strong reservations that the concept of waiver (i.e. the "intentional relinquishment of a known right," United States v. Carrasco-De-Jesus, 589 F.3d 22, 26 (1st Cir. 2009)) is apt here, particularly where defendants filed the motion at issue on August 6, 2018, the deadline the court had set at Docket No. 139.  Thus, by meeting the deadline, defendants cannot be considered to have waived the opportunity to challenge the expert's report.  See, Adams v. J. Meyers Builders, Inc., 671 F.Supp.2d 262, 270-271 (D.N.H. 2009)(rejecting "failure to object" prior to moving *in limine* to prevent experts from testifying because party moved within the period set in the court-approved jointly proposed scheduling order).

Federal Rules of Civil Procedure applicable to discovery of expert witness reports and testimony. See, Initial Ruling (Docket No. 201, pp. 2-4, 6-7).  The court found Dr. Benabe's report deficient, concluded that the deficiencies could not be cured through deposition testimony, held that plaintiffs' failure to comply with expert report disclosure requirements was neither justified nor harmless, and prohibited the expert from testifying about the items mentioned earlier.  Id. at pp. 2-9).

## C.  Arguments

Plaintiffs state they can proceed under an "ordinary" negligence theory instead of "medical malpractice" (Docket No. 219, p. 13).[3]  The theory plaintiffs put forward in the Joint Pretrial Conference Report is that this is a "medical malpractice" action (Docket No. 145, p. 15).[4]  The court approved and adopted the Report as the court's order to govern subsequent proceedings under Fed. R. Civ. P. 16(e) (Docket No. 155, p. 3).  Thus, the parties' representations in the Report replaced the pleadings, and that generally binds them in the remaining stages of the litigation.[5] See, United States ex rel. Concilio de Salud Integral de Loíza, Inc. v. J.C. Remodeling, Inc., --- F.3d----, 2020 WL 3168086, *3-*4 (1st Cir. Jun. 15, 2020)(discussing effect of final pretrial orders).

---

[3] Perhaps they so state on the assumption that under the "ordinary negligence" scenario, no expert testimony would be required to support their case.  But as discussed below, that assumption does not apply in this case.

[4] According to plaintiffs' theory, "Puerto Rico law governs this diversity tort action for medical malpractice."  See, "Joint Pretrial Conference Report" (Docket No. 145, p. 15).

[5] Plaintiffs allege that defendants' reference to a products liability case in their pretrial conference report discussion of standard of care turns this action into an ordinary negligence action.  Plaintiffs ignore the content of that discussion, one focused on clinical issues in a health care setting, which nowhere characterizes this case as one involving ordinary negligence.

Sandra Cruz Vargas-Alicea, et al. v. Continental Casualty Company, et al.
Civil No. 15-1941 (PAD)
Opinion and Order
Page 4

In any event, "ordinary negligence actions" and "medical malpractice" actions are informed by the same basic elements. That is apparent not only from Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007), which plaintiffs cite as support (Docket No. 219, p. 14), but from other cases applying Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, the basic provision pursuant to which this action was brought. As stated in Vázquez-Fillippeti:

> Under Article 1802 of Puerto Rico's Civil Code, recovery of tort damages requires a showing that the defendant by act or omission caused damage to another through fault or negligence. The three essential elements for general tort claims are: (1) evidence of physical or emotional injury; (2) a negligent or intentional act or omission (the breach of duty element) and (3) a sufficient causal nexus between the injury and defendant's act or omission (in other words, proximate cause). Id. at 49.[6]

These elements are applied in the factual context of the allegations upon which the question is predicated. Here, plaintiffs allege, among other things, that BMA-Ponce should have recognized that the deceased's medical condition presented significant risk factors that predisposed him to a fall (Docket No. 145, p. 8). As such, the allegations configure a "medical malpractice" action rather than one involving "ordinary" negligence. See, Lamarca v. United States, 31 F.Supp.2d 110 (E.D.N.Y. 1999)("Mrs. Lamarca alleges that her husband's injuries all stem from the Hospital's

---

[6] See also, Candelario v. UBS Financial Services Inc of Puerto Rico, 699 F.3d 93, 99-100 (1st Cir. 2012)(action based on financial institution's negligence in allowing plaintiff's former spouse to withdraw millions of dollars from accounts in the institution)("To prevail on a negligence claim [under Article 1802] a plaintiff must show duty, breach, causation, and damages"); De-Jesús-Adorno v. Browning Ferris Industries of Puerto Rico, Inc., 160 F.3d 839, 842 (1st Cir. 1998)(suit seeking damages for injuries that condominium's maintenance employee sustained while attempting to deposit dirt in trash container located on condominium's property and serviced by hauler)("a plaintiff suing for personal injuries on a negligence theory under Article 1802 must establish (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) a breach of that duty, (3) proof of damage, and (4) a causal connection between the damage and the tortious conduct")(internal citations omitted). And to make out a prima facie case for medical malpractice in accordance with Article 1802, a plaintiff must adduce evidence to establish: "(i) the duty owed (i.e. the minimum standard of professional skill and knowledge required in the relevant circumstances), (ii) an act or omission transgressing that duty, and (iii) a sufficient causal nexus between the breach of duty and the harm claimed." Borges ex. rel. S.M.B.M. v. Serrano-Isern, 605 F.3d 1, 6 (1st Cir. 2020).

nursing staff's improper assessment of the patient's fall risk status.  Because the determination of whether a patient is a fall risk is an act which is a matter of medical science … this action involves medical malpractice")(internal quotations omitted).

Given that medical knowledge is critical to demonstrating the parameters of the health-care provider's duty in this case, expert testimony is required.  See, Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993)(examining topic).[7]  So too with causation.  See, Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico, 394 F.3d 40, 43 (1st Cir. 2005)(as with duty of care, "a factfinder normally cannot find causation without the assistance of expert testimony to clarify complex medical and scientific issues that are more prevalent in medical malpractice cases that in standard negligence cases").

**D.  Standard of Care**

Puerto Rico holds health care professionals to a national standard of care.  See, Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 190 (1st Cir. 1997)(stating standard).  In this way, "[i]nstead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care."  Lama v. Borrás, 16 F.3d 473, 478 (1st Cir. 1994).  Reference to national standard of care means that "[t]he physician must employ a level of care consistent with that set by the medical profession nationally."  Borges, 605 F.3d at 7.  So, in the instance of the physician involved in that

---

[7] Explaining why expert testimony was required in Rolón-Alvarado, the First Circuit observed, "The questions plaintiff has raised anent decedent's care involve matters of timing, differential diagnosis and hospital protocol- matters which are neither obvious to the untrained eye nor, by any stretch, within a layman's ken.  Where, as here, medical personnel make on-the-spot decisions, requiring sophisticated medical insights, a jury cannot be expected to evaluate those judgment calls without the aid of expert opinion."  Rolón-Alvarado, 1 F.3d at 79.  As should become apparent from the discussion that follows in the text, the same reasoning applies in the case at hand.  Incidentally, expert testimony is not exclusive of medical malpractice claims under Article 1802 of the Civil Code.  See, Aponte-Bermúdez v. Colón, 944 F.3d 963, 964 (1st Cir. 2019)(explaining that under Puerto Rico law, a claimant in a negligent design case ordinarily must put up an expert to opine on the applicable standard of care).

case, an obstetrician, the First Circuit warned that, "an obstetrician … must use the same level of care that is generally accepted as good practice in the obstetrical subspecialty, *nationwide.*" Id. (emphasis added). To comply, plaintiffs must prove that the asserted standard of care is "nationally used." Clemente-Vizcarrondo v. United States, 2020 WL 748840, *4 (D.P.R. Feb. 14, 2020). Absent proof of this element, "it is virtually impossible to prove either breach or proximate cause." Rolón-Alvarado, 1 F.3d at 80 n.6.

Within these parameters, the Initial Ruling observed that the national standard of care may be shown by: (1) evidence of discussions about the described course of treatment among practitioners outside of Puerto Rico such as at conventions, meetings or seminars; (2) presentation of relevant data like published protocols and standards; or (3) reliance on peer-reviewed literature (i.e. journals, textbooks, and treatises). See, Initial Ruling (Docket No. 201 at p. 3). The list is not exhaustive. However, an expert does not describe a national standard of care by merely stating what he would have done differently. See, Cortés-Irizarry, 111 F.3d at 190 (citing Rolón, 1 F.3d at 78 (addressing issue).[8]

Turning to this case, plaintiffs' expert's report concludes that the available data shows deviations from what should be the standard of care of unstable patients in a dialysis unit (Docket No. 53-8, p. 4). Stating what the standard of care *should be,* however, is not synonymous with

---

[8] See also, Meek v. Shepard, 484 A.2d 579, 581 (D.C. 1984)(rejecting testimony of expert who stated what he would do under similar circumstances rather than describe national standard of care by which the defendant's actions could be measured). In the Initial Ruling the court cited Meek and other cases from the District of Columbia ("D.C."), among other cases, to inform its analysis. See, Initial Ruling (Docket No. 201, pp. 3-4). Plaintiffs assert that those cases are not binding (Docket No. 159, p. 3). True enough, but the cases were cited not because they are binding, but because they persuasively identify objective criteria to evaluate whether an expert has described a national standard of care. In the same way, the First Circuit has cited out-of-circuit, and even state cases to analyze standard of care in medical malpractice actions subject to Puerto Rico law. See, Rolón-Alvarado, 1 F.3d at 78 (citing, among other cases, Campbell v. United States, 904 F.2d 1188 (7th Cir. 1990), Polikoff v. United States, 776 F.Supp. 1417 (S.D. Cal. 1991), East v. United States, 745 F.Supp. 1142 (D. Md. 1990), and Walski v. Tiesengas, 72 ILL.2d 249, 21 Ill. Dec. 201, 381 N.E. 2d 279 (1978)).

asserting what the national standard of care *is*, much less that such standard reflects a national standard.[9]  Professional standards "require normative judgments, not merely proof that a better way to treat a particular patient could have been devised."  Rolón-Alvarado, 1 F.3d at 78.  For that reason, the court observed in the Initial Ruling that Dr. Benabe's report did not identify the national standard of care that applies in this setting.  See, Initial Ruling (Docket No. 201, pp. 3, 6).

Plaintiffs take issue with this determination, arguing that the court should have followed Pages v. Ramírez-González, 605 F.3d 109 (1st Cir. 2010) and Casillas-Sánchez v. Ryder Memorial Hosp., Inc., 14 F.Supp.3d 22 (D.P.R. 2014) (Docket No. 219, p. 13).  In their view, these two cases "show that the law in this Circuit is that an expert's credentials, together with a detailed description of what the defendants should have done, is sufficient."  Id.

In Pages-Ramírez, the District Court ruled that Dr. Carolyn Crawford, a specialist in neonatal-perinatal medicine, would not be permitted to provide her opinion as to obstetrical standards of care, departures from those standards or causation.  See, 605 F.3d at 115-116.[10]  The First Circuit noted that "[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline" (id. at 114-115); reviewed Dr. Crawford's extensive credentials (id.); and reversed, concluding that those credentials easily met and surpassed the standard for admissibility of expert testimony.  Id. at 111, 116.  In

---

[9] One can say what the standard of care *is* and evaluate whether the party should have done or should not have done something in light thereof.  See, Díaz Colón v. United States, 178 F.Supp.2d 53, 55 (D.P.R. 2001)(referring in medical malpractice case subject to Puerto Rico law, to "what *is or is not* the proper practice")(emphasis added).  By contrast, the term *should be* means "that ought to be."  Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/should-be  (Accessed on June 25, 2020).

[10] After a Daubert hearing, the District Court explained that "Dr. Crawford testified that she was not board-certified in OB/GYN, and that she had no privileges to administer [P]itocin to a patient or to perform a cesarean section.  She further testified that although she serves as a consultant at high-risk[ ] births, it is the OB/GYN who actually delivers the baby and makes the final decisions regarding delivery.  Accordingly, the Court rule[s] that Dr. Crawford's testimony be limited to exclude any testimony regarding OB/GYN standards of care, departures from OB/GYN standards of care, and causation."  Pages-Ramírez, 605 F.3d at 114, 116.

consequence, the case does not deal with the applicable standard of care but with whether the expert witness could testify as to that standard, as well as to deviation and causation.

In Casillas-Sánchez, defendants challenged a verdict under Fed. R. Civ. P. 50(b), alleging that plaintiffs failed to prove a medical malpractice claim pursuant to Article 1802 of the Puerto Rico Civil Code.  See, 14 F.Supp.3d at 24.  The sister court described plaintiffs' expert witness' testimony, which the court characterized as "detailed" (id. at 25-26); concluded that the expert had set forth a standard of knowledge and skill required for the removal of stones from a patient with the deceased's conditions; found that the expert sufficiently outlined the minimum acceptable standard of care and the codefendant physician's failure to meet it; and denied the motion.  Id. at 26.

Proffering detailed testimony through an expert witness does not, without more, satisfy the obligation to show what is the national standard of care that a defendant allegedly deviated from. And the court does not read Casillas-Sánchez as explaining why the detailed testimony that the sister court alluded to, reflected a national standard.  For that reason, in the Initial Ruling it observed that "defendants in Casillas-Sánchez did not challenge the extent to which the standard that plaintiffs' expert witness testified about reflected a national standard," and that "[correspondingly] the district court did not have occasion to analyze the problem by examining sources of information that would confirm that the expert had relied upon a national standard of care."  See, Initial Ruling (Docket No. 201, at p 7 n. 8).

Together with the motion *sub judice*, plaintiffs filed copy of the motion that the Casillas-Sánchez court was ruling on, to wit: "Second Joint Motion for Judgment as a Matter of Law in accordance with Fed. R. Civ. P. 50(b)" ("Second Joint Motion") (Docket No. 219-1).  They contend that in that motion, defendants complained that the expert's testimony was devoid of specific

reference to "that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession" (Docket No. 219, pp. 8-9), the same standard they posit the First Circuit has recognized in holding that Puerto Rico follows a national standard of care.  Id. at p. 9.

The Second Joint Motion includes the quoted language.  See, Docket No. 219-1, at pp. 5, 7.  But other than complaining about absence of reference to publications,[11] it does not specifically explain why the testimony in question was insufficient to show what was the national standard of care that applied in that case, a fatal approach, for as the Initial Ruling recognized, there are different ways to identify the national standard of care, and they are not limited to publications.  See, Initial Ruling (Docket No. 201), at p. 3.[12]  Hence, the Casillas-Sánchez court rejected the "lack of reference to specific medical literature" argument, noting in part that Federal Rules of Evidence

---

[11] See, Second Joint Motion at 4 (The expert "did not mention nor produce any single piece of specific medical literature in order to establish the alleged standard of care that was applicable to the removal of the gall bladder"), at 5 ("Appearing parties move this Honorable Court to take judicial notice, that in accordance with the Federal Rule 201 of Evidence, that on a medical malpractice trial, specifically where the standard of care dealing with general surgery is the issue on question, expert witnesses must support their opinion on medical literature such as _Principles of Surgery by Schwartz_ or _Sabiston's Textbook on Surgery_.  In the instant case plaintiffs did not produce a single piece of medical literature nor did their expert witness refer to any specific medical literature to support his opinion regarding the applicable standard of care") at 6 ("Also [the expert's] opinion as to the period of time that a gallbladder's stone take to form, he did not find any medical literature that supported his opinion") at 9-10 ("[The expert] never … mentioned a single piece of literature or a textbook that established what was the standard of ca re to be followed in this case regarding the four techniques that Dr. Cardona must have followed") at 10 ("There is no doubt that after a careful review of [the expert's] testimony transcript, he did not make any explicit or implicit reference to any medical literature our textbook be it modern or ancient on which he relied for his testimony …") at 11 (In the instant case plaintiffs presented as their expert witness Dr. Tomas Torres Delgado, a General surgeon who did not testify as to the duties established by the standard of care in the specialty of general surgery.  There is no single mention as to any piece of medical literature used or reviewed by plaintiffs' expert in order to support his testimony").

[12] On the same subject of expert testimony and publications, see, Delgado v. Dorado Health, Inc., Report and Recommendation, 2016 WL 4742257, *2-*4 (D.P.R. Sept. 2, 2016) and cases cited therein, 2016 WL 4742259, *1 (D.P.R. Sept. 12, 2016) adopting Report and Recommendation (denying motion to exclude expert's report and testimony predicated on argument that expert did not include citations to treatises, textbooks or articles in support of opinion).

703 and 705 do not require an expert to mention or produce literature.  See, Casillas-Sánchez, 14 F.Supp.3d at 26, n.5.[13]

At the same time, the court reviewed the transcript of the plaintiffs' expert's trial testimony at issue in Casillas-Sánchez, testimony that necessarily informed the sisters court's view of that testimony in its evaluation of defendants' challenge.  Therein, plaintiffs' record counsel pointed out that the case involved gallbladder surgery and common bile duct exploration.  See, Trial Transcript, Civil No. 11-2092 (Docket No. 151, p. 74).  In turn, plaintiffs' expert witness explained that he kept up-to-date with techniques and standards of care for laparoscopy, of gallbladder surgery and/or common bile duct exploration by attending conventions and conferences of the Puerto Rico Chapter of the American College of Surgeons and conventions of the International College of Surgeons.  Id. at 74.  Additionally, he attended several conventions and conferences of the American Society of Laparoscopic Surgery.  Id. at 73-75.

In this manner, the expert in Casillas-Sánchez relied on sources that the Initial Ruling identified as acceptable to show what is the national standard of care.  More than credentials, those

---

[13] Plaintiffs argue the Casillas-Sánchez court based its conclusion "on several sources, including Tocent v. Mar Overseas Corp., 991 F.2d 5, 10 (1st Cir. 1993), which does not state that an expert needs to establish, with evidence such as medical literature, a national standard of care in an expert report" but "[q]uite the opposite" (Docket No. 219, p. 10).  Indeed, Tocent does not state what plaintiffs say it does not state.  Tocent addressed the defendant's argument that "the trial court erred by allowing plaintiff's expert witness to answer a hypothetical question that improperly assumed facts not in evidence."  See, 991 F.2d at 10.  The First Circuit rejected the argument, concluding that sufficient facts existed to support the challenged hypothetical; observed that Rules 703 and 705 of the Federal Rules of Evidence place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination; and during its cross-examination of plaintiff's expert witness, defendant elected not to explore any perceived discrepancies or inconsistencies relating to the hypothetical and did not explicitly call the attention of the trial court or counsel to the discrepancy it raised on appeal.  Id.  But the dispute in the case at bar is not about hypotheticals.  Plaintiffs state the court here erred in holding that Dr. Benabe "had to not only cite medical literature (or other such sources) in his report, but also specifically tie it to his opinions in such report" (Docket No. 219, p. 12).  As stated above, the Federal Rules of Evidence do not require experts to cite medical literature, and the court did not state otherwise in the Initial Ruling, pointing out instead that references to literature was a way (among others) to show what is the national standard of care.  See, Initial Ruling (Docket No. 201, pp. 3-4).  As for linking opinions about standards to facts, Rule 26 categorically requires experts to include in their reports a complete, *not* a partial statement of their opinions, and the basis and reasons for them.  See, Fed.R.Civ.P. 26(a)(2)(B)(stating requirement).

sources link professional judgments to national standards. With that testimony as foreground, the

Casillas-Sánchez defendants' challenge was bound to fail. Yet the report here lacks references to

similar criteria. But there is more. The report does not address the care that the deceased received

in the hospital and is silent as to a note that a BNA-Ponce nurse discarded after the incident at

issue. And while the expert's report mentions publications in a footnote, it does not relate the

content of those publications to whether the relevant course of treatment is followed nationally.

Simply mentioning titles of publications does not establish a standard. See, Conn v. United States,

880 F.Supp.2d 741, 747 (S.D. Miss. 2012)("Even if Dr. Strong had not failed to identify a specific

Guideline publication, and even if he had not failed to identify a specific suggestion contained

within such a publication, he still would have failed to state that the conduct recommended by the

Guidelines marked the standard of care of a minimally competent physician); Baker v. Chevron

USA, Inc., 680 F.Supp.2d 865, 878 (S.D.Ohio 2010) (concluding that expert report was inadequate

in part because expert made no effort to connect the medical literature to expert's opinions)(Docket

No. 201, pp. 3-4).[14]

---

[14] Citing Thompson v. Doane Pet Care Co., 470 F.3d 1201, 1203 (6th Cir. 2006), plaintiffs take issue with this analysis (Docket No. 219, p. 11). In Thompson, the District Court had ruled that the expert-a certified public accountant – could "only read the report [to the jury] and not one word more." 470 F.3d at 1202. Further, it ruled that because the summary report did not expressly state that the witness' opinion and calculations were based on "generally accepted accounting principles," the witness could not even read his report to the jury at all. Id. The Sixth Circuit disagreed, observing that Rule 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. Id. at 1203. Considering the absence of an alternative accounting convention pertinent to the case, it assumed that certified public accountants base their calculations and opinions on the normal general standards of their profession, i.e. generally accepted accounting principles. The Sixth Circuit's view of Rule 26 is not contrary to the Initial Ruling. See, Docket No. 201, p. 6, referring the reader to Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 63-64 (1st Cir. 2011), where the First Circuit rejected plaintiff's argument that expert witness exceeded the bounds of his report, for even though the expert used different words at trial, his testimony was a reasonable elaboration of the opinion disclosed in the report. And the Sixth Circuit's decision to assume that in the absence of an alternative accounting convention pertinent to the case, certified public accountants base their opinions on the generally accepted accounting principles does not assist plaintiffs. Those principles set the standards for that expert witness' profession. Id. at 1203. In contrast, plaintiffs' expert's report concludes referring to what the standard of care should be, not to what is the national standard of care.

E. **Expert Witness Discovery Rules**

Fed.R.Civ.P. 26(a)(2)(B) calls on the parties to make "explicit and detailed expert disclosures." Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este and Sara López, M.D., 456 F.3d 272, 276 (1st Cir. 2006).   In particular, it provides that expert witness reports must contain: (1) a complete statement of all opinions the witness will express and the basis and reasons for them; (2) the facts or data the witness considered in forming the opinion(s); (3) any exhibits that will be used to summarize or support the opinion(s); (4) the witness's qualifications, including a list of all publications authorized in the previous 10 years; (5) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (6) a statement of the compensation to be paid for the study and testimony in the case. Id. The expert's work does not, however, end there.  See, Lawes v. CSA Arquitects and Enginners LLP, ---F.3d---, 2020 WL 3286790, *12 (1st Cir. Jun. 18, 2020)(so noting).

Rule 26(e) instructs parties that expert disclosures "must be kept current." Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003).  During litigation, experts must supplement their reports at the court's request or when a party learns that its disclosure or response is incomplete or incorrect and the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.  See, Lawes, ---F.3d----, 2020 WL 3286790 at *12 (stating formulation).  The duty to supplement extends to information included in the expert's deposition.  Id.

In line with these requirements, expert disclosures must be complete and timely so that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial, and so as to shorten or decrease the need for expert depositions and conserve resources.  See, Ortiz-López v. Sociedad Española de Auxilio Mutuo y Beneficiencia, 248 F.3d 29, 35 (1st Cir. 2001)

(examining topic); R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010) (similar); Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 284 (8th Cir.), *cert. denied* 516 U.S. 822 (1995)(same).  The report is deemed adequate when it is sufficiently detailed in a manner that eliminates surprise and unnecessary depositions with the attendant reduction in cost. See, Reed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996)(so noting).  Under this standard, Dr. Benabe's report falls short.

**F.  Depositions**

Failure to comply with Fed. R. Civ. P. 26(a)(2)'s requirements may result in sanctions.  See, Lawes, ---F.3d----, 2020 WL 3286790 at *12 (so recognizing).  Pursuant to Fed. R. Civ. P. 37(c)(1), if a party fails to provide the information required by Rule 26(a), that party is precluded from using the undisclosed information on a motion, at a hearing, or at trial, unless the failure to comply was "substantially justified or harmless." Id.  Plaintiffs contend that exclusion of the expert's testimony is not justified because the defendants deposed Dr. Benabe and therefore cannot complain of harm (Docket No. 219, pp. 6-7).

A number of courts have precluded parties from curing defective reports with deposition testimony.  See, Ciomer v. Cooperative Plus, Inc., 527 F.3d 635, 642 (7th Cir. 2008)(rejecting attempt to cure deficiencies in report by filing in court a transcript of the expert's deposition); Parillo v. Lowe's Home Center, 2017 WL 4171691, *1 (S.D.Ohio Sept. 19, 2017)(excluding opinions provided for the first time during expert's deposition); Robinson v. Nationwide Mut. Fire Ins. Co., 2012 WL 5866302, *1 (N.D.Miss. Nov. 19, 2012)(finding wholesale incorporation of an expert's deposition as a supplemental expert report improper); Honeywell Intern., Inc. v. Universal

Avionics System Corp., 289 F.Supp.2d 493, 500 (D.Del. 2003)(excluding testimony about doctrine

of equivalents because it was not contained in expert's report).[15]

From this perspective, were the rule otherwise, the function of expert witness reports would

be completely undermined.  See, Ciomer, 527 F.3d at 642 (addressing topic).  In consequence, in

each such case, the report delimited what the expert could say during trial.  And as in those cases,

the Initial Ruling followed that line to exclude Dr. Benabe's testimony.  See, Initial Ruling (Docket

No. 201), pp. 6-9. [16]

Plaintiffs argue that the court should have applied Gay, 660 F.3d at 58 (Docket No. 219, p.

3).  That case involved a life insurance coverage dispute, as part of which the First Circuit rejected

plaintiff's argument that the defendant's expert witness exceeded the bounds of his report.  For

---

[15] See also, Estate of Bojcic v. City of San Jose, 358 Fed.Appx. 906, 907-908 (9th Cir. 2009)(district court did not abuse its discretion by precluding expert from testifying as to opinion not included in the expert's report); Chiriboga v. National R.R. Passenger Corp., 2011 WL 2295281, *5 (N.D.Ill. Jun. 9, 2011)(expert stated in his report that the purpose of his analysis was to examine whether the deceased could have seen the lights of a locomotive before he started walking onto the crosswalk but because nowhere in the report was there information regarding the decedent's inability to detect motion from the train's headlights or any scientific data backing such an assertion, the Court excluded the opinion (Opinion 3)).

[16] Plaintiffs question these principles, stating that the Initial Ruling cited Meyer Intellectual Properties Ltd. v. Bodum, Inc., 715 F.Supp.2d 827 (N.D. Ill. 2010), a patent case they describe as "wholly inapplicable here," which was reversed or vacated in Meyer Intellectual Properties Ltd. v. Bodum, Inc., 690 F.3d 1354 (Fed.Cir. 2012) (Docket No. 219, p. 3).  And they complain the Initial Ruling cited to Medtronic Inc. v. Guidant Corp., 2004 WL 5501181 (D.Del. 2004), an intellectual property case, which ruled that "Plaintiff's motion in limine no. 3 to preclude defendants from offering expert opinion testimony regarding the prosecution of the patents-in-suit (D.I. 92) is granted to the extent that all experts are confined to the opinions expressed in their expert report" (Docket No. 219, p. 4).  Plaintiffs argue that the case's persuasive value is called into doubt because the requirements for expert reports in Fed.R.Civ.P. 26 were substantially amended in 2010, and express that Medtronic does not have legal citations, which to plaintiffs' way of thinking means that the ruling court did not intend to opine on the law. Id.  That a case deals with patents and intellectual property does not mean that it falls outside the purview of Rule 26's expert witness report requirements.  In fact, plaintiffs cite to cases addressing expert's reports that do not involve health care at all.  See, e.g. Richman, 415 F.Supp.2d at 929, 931 (excessive force under 42 U.S.C. § 1983)(Docket No. 219, p. 8).  Plaintiffs do not explain why the 2010 amendments to Rule 26 undermine the Medtronic court's decision to confine experts to the opinions they express in their reports.  In fact, Medtronic has been cited with approval in this District.  See, Arrieta v. Hospital del Maestro, 2018 WL 3425295, *2 (D.P.R. Jul. 13, 2018).  Because Meyer was reversed or vacated, however, it should have been removed from the final draft of the Initial Ruling.  That said, Meyer and Medtronic were cited as part of a discussion that included citations to R.C. Olmstead v. CU Interface, 606 F.3d at 262, and Sylla-Sawdon v. Uniroyal, 47 F.R.D. at 277 (Docket No. 201, pp. 6-9), none of which plaintiffs discuss.  At any rate, as will be explained below, upon further deliberation the court departs from this approach.

context, the decedent died during a trip to a casino in Lincoln, Rhode Island.  While at the casino,

she fell.  When medical personnel arrived to treat her, she was unconscious and appeared to have

suffered a head injury from the fall.  She was transported to a local hospital, but when her condition

deteriorated, she was transferred to Rhode Island Hospital in Providence.  She passed away the

next day.  The central issue in dispute was whether the circumstances of death precluded coverage

under the policies.  See, Gay, 660 F.3d at 59-60.

The insurance policy provided for coverage if the death was caused by an accident directly

and indirectly of all other causes and denied coverage if the death was caused by an injury due to

disease, bodily or mental infirmity, or medical or surgical treatment of these.  Because the evidence

indicated that more than one factor contributed to the decedent's passing – a stroke and skull

fracture – plaintiff, the executor of the decedent's estate, bore the burden of separating out the

consequential causes from the inconsequential causes of her death.  See, Gay, 660 F.3d at 60-61.

As the District Court summarized the report in question, it contained at least three relevant

conclusions: (1) that cerebral hemorrhage seemed certain; (2) the amount of bleeding seemed out

of proportion to that which could be expected on the basis of trauma alone; and (3) a preceding

hypertensive cerebral hemorrhage did in fact lead to unconsciousness, that as a result the patient

fell sustaining a serious head injury, and that the hypertensive cerebral hemorrhage was a

contributing cause of death.  See, Gay, 660 F.3d at 63.  During trial, the expert opined that the skull

fracture contributed to the decedent's passing but was not a major cause of death.  He said the skull

fracture did not seem like a mortal wound, and on cross-examination conceded that his report did

not expressly indicate that the skull fracture was not a mortal wound or that the stroke was a major,

as opposed to a contributing cause of the decedent's death.  Id. at 61.  The District Court determined

that the expert's report adequately presaged his trial testimony, finding that the report was

sufficiently thorough to indicate the general boundaries of his direct examination, and to put the plaintiff on notice that the stroke was the primary cause of the decedent's passing.  Id. at 63.

The First Circuit sustained the ruling, observing that the opinion expressed in the report was that "fundamentally," the decedent suffered from a stroke, and while it suggested that both the stroke and the skull fracture contributed to the decedent's death and never explicitly stated that the stroke was the dominant cause of death, it "clearly focused on the stroke."  See, Gay, 660 F.3d at 63-64.  Even though the expert used different words at trial, the First Circuit concluded that his testimony was a reasonable elaboration of the opinion disclosed in the report, viz., that the amount of bleeding described seemed out of proportion to that which would be expected on the basis of trauma alone.  Id. at 64.  Thus, it determined that based on the expert report, plaintiff reasonably could have anticipated the expert's testimony and therefore, could not have been unfairly surprised to warrant striking the challenged testimony.  Id.

## G.  Reassessment

A closer look at the potential exclusion of testimony here in light of Gay and other sources of authority, persuades the court to reconsider the Initial Ruling and to instead examine whether, and to what extent deposition testimony cured the expert report's analytical gaps or shortcomings. This approach has resulted in admissibility in some cases and exclusion in others.  To illustrate, in MMG Ins. Co. v. Samsung Electronics America, Inc., 293 F.R.D. 58 (D.N.H. 2013), the Court examined the implications of previously undisclosed support for reported opinions, evaluating such testimony as part of the harmlessness inquiry of Rule 37(c)(1).  Id. at 61-62.  It observed that the expert's report had made no reference to the fact that the expert had attempted and succeeded in setting fire to the DVD tray and circuit board from an exemplar of a home entertainment system, even though deposition testimony revealed that "burn testing" was among the bases and reasons

for the opinion that a "failure/overheating of the power supply" within the system started the fire at issue.  During the deposition, however, the expert did not describe the testing in any detail.  Therefore, the Court concluded that the expert's deposition testimony failed to cure the report's deficiencies.  Id.

By contrast , report deficiencies were considered cured in Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 889 (8th Cir. 2006), where the expert relied on x-rays not disclosed in his report, but discussed those x-rays during his deposition, making the Rule 26 violation harmless; and Scottsdale Ins. Co. v. Deere & Co., 115 F.Supp.3d 1298, 1304-1305 (D.Kan. 2015), where expert's report did not satisfy Rule 26 because, among other things, it insufficiently explained the expert's reasoning and facts and data on which his opinion was based.  However, the expert was deposed, and during deposition defendant probed upon the facts, the methods, processes and reasoning underlying the expert's opinion.  In consequence, the Rule 26 violation was considered harmless under Rule 37(c)(1).

**H.  Application of Test**

Against this backdrop, the court reexamines Dr. Benabe's report and deposition testimony with respect to two areas of inquiry: (a) standard of care and deviations; and (b) causation.  The discarded note and hospital care are in a somewhat different posture, for albeit the note was covered during the deposition, it was not included in the expert's report; and no opinions on hospital care were proffered at either the report stage or at the expert's deposition.  As discussed below, these two instances are tested for surprise and prejudice.

**a.  Standard of Care/Deviations**

It is the plaintiff's obligation to adduce evidence "sufficient to show both the minimum standard of care required" and the health-care provider's "failure to achieve it."  Borges, 605 F.3d

at 7.  In the clinical events analysis section of the report, Dr. Benabe refers to omissions, put differently, to things not done.  See, BLACKS LAW DICTIONARY (11th Ed.), p. 1311 (including as one of the definitions of "omission," "[a] failure to do something").[17]  The report expresses that BMA-Ponce *should* have recognized that, as a dialysis patient with a history of severe hypertension, anemia and intermittent hyperkalemia, who had just finished a hemodynamically compromising procedure, the deceased presented significant enough risk factors to predispose him to a fall (Docket No. 65-8, p. 4).  It states that the deceased *should* never have been allowed to stand, much less walk without assistance from the dialysis personnel until it was assured and documented that his blood pressures where stable and he was able to ambulate without assistance. Id.  It points out that measurement of a BP (blood pressure), whether standing or sitting, as reported to be 183/63 or 163/83 followed by 120/110 during or immediately after seizures is consistent with a marked decrease in BP, of at least >40 to >60 mmHg that, "somehow was missed by the personnel."  Id.   (In other words, BMA-Ponce's personnel *should* have realized this.)

The report characterizes these situations as routine day by day happenings at a dialysis unit that *merits* the presence of a physician in addition to the dialysis personnel, noting further that supervisory responsibilities cannot be efficiently performed at a distance through telephone communications (Docket No. 65-8, p. 4).  It describes as most striking, the absence of notes by an evaluating physician in the dialysis unit *even when the clinical events merited* his presence and assessment.  Id.  And it refers to these omissions as "deviations."  Id.

---

[17] See also, WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH (3d College Ed.), defining omission in part as "failure to do as one should."  Id. at p. 945.

Generally, "deviation" is defined as "a change from a customary or agreed on course of action; a noticeable difference from what is expected (as in) deviation from the normal procedure." BLACKS LAW DICTIONARY, *supra*, p. 566.[18]  By describing the clinical events in question as deviations, the report necessarily calls attention to the standards from which they departed and against which they must be measured.  And those parameters may be implied from the word "should," that the report uses to contrast actual from expected behavior, that is, what BMA-Ponce should have done or should not have done.  This methodology is apt.  See, Lees v. Carthage College, 714 F.3d 516, 524 (7th Cir. 2013)("Dr. Kennedy identified the standard of care … and concluded that Carthage's practices fell short of that standard in numerous respects.  Specifically, he opined that Carthage should have installed a prop alarm in the basement door at Tarble Hall; that the lobby should have been staffed between midnight and 2 a.m.; that visitors should have been escorted to dorm rooms; that the building should have used security cameras; and that students should have been told to close their doors when they were not socializing, especially late on weekend nights).[19]

Despite this elucidation, the report ends up concluding that the omissions deviated from what the standard of care should be, and while it characterizes the relevant clinical events as everyday happenings in a dialysis unit, it does not refer to objective criteria indicative of a national

---

[18] See also, WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH, *supra*, defining "deviation" as "the act or an instance of deviating; specif: (a) sharp divergence from normal behavior."  Id. at p. 377.

[19] See also, Macaulay v. Anas, 321 F.3d 45 (1st Cir. 2003), where the First Circuit observed that, "… Dr. Albert testified unequivocally that the screws used in spinal fusion surgery should be placed within the boundary of the pedicles.  He then testified that several of the screws that Dr. Anas had inserted in the appellant's spine were not so configured; instead, they were malpositioned or misplaced.  Although the appellant labors to characterize these comments as statements of fact, they bore directly on the standard of care required in the course of performing spinal fusion surgery. The statements also suggested (or at least supported a reasonable inference) that Dr. Anas had violated this standard of fusing the appellant's spine.  Id. at 54.

standard at work here.  Even still, considering that the report alludes to specific deviations in the particular setting of a dialysis unit, they fall on the permissible side of the "further inquiry" spectrum, opening the door for the expert to elaborate upon and more fully explain in a deposition his previously reported opinions on these subjects.

To this end, Dr. Benabe testified about his professional credentials, training and experience. On this account, he is a certified renal disease expert, a nephrologist with experience dealing with dialysis patients, patients with chronic renal insufficiencies, and patients with hypertension (Docket No. 74-4, p. 34).  He was part of the faculty of the Veterans Administration ("VA") Medical Center in Puerto Rico from 1981 until 1991, and from 1993 until 2012.  Id. at 10, 13.[20] He saw patients in the VA's renal clinic and in the VA's dialysis clinic.  Id. at 12-14.  The renal clinic dealt with patients who had moderate to severe immunodeficiencies not requiring dialysis, whereas the dialysis clinic handled patients on dialysis.  Id. at 14.  Dr. Benabe saw patients in the treatment area and in an office setting.  When he was the attending on rounds, he saw patients at least three times a week or whenever he was called because of problems with any of the patients. Id.  His office was close to the dialysis unit, and for a while he was chief of the Renal Division. Id. at 14-15.

Dr. Benabe testified that given the deceased's medical history and condition – treatment incompliance, chronic kidney disease, severe hypertension, hyperkalemia, anemia, high potassium – and the fact that he was finishing a procedure with major hemodynamic changes that required continuing observation and assistance in his ambulatory needs, BMA-Ponce should have had a physician present during the patient's dialysis to make sure that he was stable during the dialysis,

---

[20] There is no suggestion that plaintiffs failed to timely disclose Dr. Benabe's *curriculum vitae* with the information required by Fed.R.Civ.P. 26(a)(2)(B).

and to ensure that the blood pressure was well controlled and the potassium level reasonable (Docket No. 74-4, pp. 96-9, 132).  He said a physician would make certain that personnel taking care of the patient do the right thing, including properly checking the blood pressure at the end of the procedure, confirm that necessary chemistries are taken, and following up once results are available.  Id. at 131.  He stated the physician would verify that nurses accurately take the patient's standing blood pressure measurement, and that the patient is assisted in moving from the dialysis chair to the waiting area.  Id. at 132-133.  He pointed out that BMA-Ponce should have measured the patient's blood pressure while the patient was standing, making sure he was not going to have orthostatic changes that could lead to a fall and/or seizure, and if the patient's blood pressure coming down was lower than when he was sitting, BMA-Ponce had to take necessary measures to put the patient back into the sitting position and tell him not to stand up.  Id. at 146-147.  Asked specifically what he meant by deviations, he answered:

> The deviation of not following on a plan to address the multiple factors that had [the] patient at a higher risk or a major complication, such as a fall.  The deviation of not properly documenting with consistency that he was not going to suffer from major blood pressure changes after the treatment was dealt with.  And the deviation that it appears that his case was like someone on automatic pilot because the pilot was not present.  The physician never showed up, even though he doesn't necessarily have to be present.  But the fact that he underwent a major event that led to a hospitalization and the draining of a subdural hematoma required at least the present of the primary physician at the hospital.  That never happened (Docket No. 74-4, p. 162-163).

Further, Dr. Benabe was asked about the types of occurrences and routine day-to-day happenings at the dialysis clinic that merit the presence of a physician, to which he responded, the ones he and the deposing counsel had been talking about the entire day at the deposition (Docket No. 74-4, p. 153).  Additionally, he was asked if *normally*, after the dialysis machine is stopped and the nurse removes the needles, they place a gauze on the wound to stop the bleeding (Docket

No. 74-4, p. 79); how long this process *usually* takes (id.); how long does it take a patient to seal

properly after treatment *regularly* (id.); if the procedure went *normally* (id.) if he would *normally*

expect complications after a normal procedure (id. at 80); handwritten notes taken by nurses which

are then entered into a computer (to which Dr. Benabe responded alluding to the standard operating

procedure of the nursing personnel *in all units he had been*) (id. at 86-87); if laboratories are

required before and after every dialysis treatment (to which he answered that it was the standard

operating procedure *in the VA* in case of suspected complications) (id. at 89); is the hemoglobin

level considered *normal* for a dialysis patient (id. at 143); whether *all* dialysis patients require

assistance walking after dialysis treatment (id. at 145); whether dialysis patients are predisposed

to falling (id.) and if it is *common* to give dialysis patients anticoagulants during treatment (id. at

150).

Read together, the words "normal," "usual," and "regular" are most naturally understood

as standards.  For instance, "normal" has been defined as "conforming with or constituting an

accepted standard, model, or pattern… [implying] conformity with the established norm or

standard."  WEBSTER'S NEW WORD DICTIONARY OF AMERICAN ENGLISH, *supra*, p.

925.  In turn, "usual" refers to "such as is in common or ordinary use."  Id. at p. 1470.  Put another

way, the term "applies to that which past experience has shown to be the normal, common, hence

expected thing."  Id.  The definition of "regular" includes "conforming to a standard or to a

generally accepted rule or mode of conduct" and "usual, customary."  Id. at p. 1131.[21]  And

"common," may be understood as "met with or occurring frequently." Id. at p. 281.

---

[21] See also, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d Ed.), defining
"regular" as "customary, usual, or normal." Id.at p. 1521.  It defines "customary" as "commonly practiced." Id. at p.
452.

As applied here, these terms are tied to clinical standards.  Further, the VA is a national institution.  So, considering the deposition testimony as a whole, it is reasonable to infer that Dr. Benabe's opinion on these matters reflects a standard of care, one that is followed nationally.  See, Cortés-Irizarry, 111 F.3d at 190 (…[W]e treat Dr. Nathanson's references to the 'average gynecologist' and to 'the prevailing medical standard' as meaning national standard of care").  For that reason, Dr. Benabe may testify as to the standard of care and how BMA-Ponce deviated from that standard in this case.

### b.  Causation: Nexus between Deviation and Death

The report states that drop in the blood pressure – the one BMA-Ponce should have detected – is the most likely explanation for 1st: the seizures, 2d: the fall and 3d: the head trauma which lead to the deceased's demise (Docket No. 65-8, p. 4).  On its face, the statement is problematic from an evidentiary standpoint.  Pursuant to Fed. R. Evid. 702, an expert witness may testify in the form of opinion or otherwise if "the testimony is based on sufficient facts or data." Id.  In applying this rule, the district court serves as the gatekeeper for expert testimony by ensuring that "it both rests on a reliable foundation and is relevant to the task at hand."  Milward v. Rust-Oleum Corp., 820 F.3d 469, 473 (1st Cir. 2016)(quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993)).[22]

Moving from the general to the particular, the report's conclusion contains an analytical gap.  The events it refers to did not occur simultaneously.  The passing occurred in the hospital, not in the dialysis clinic.  Nor did it occur on the same day, but three days after the fall, following

---

[22] See also, Grand Slam Club/Ovis v. International Sheep Hunters Association Foundation, Inc., 2008 WL 11375373, *4 (N.D.Ala. Jan. 15, 2008)("Rule 702 is designed to ensure both that expert evidence has an adequate factual basis and that it meets a minimum standard of reliability").

hospitalization, surgery and post-operative care.  The report does not include any opinion as to the treatment that the deceased received in the hospital (Docket No. 74-4, p. 116).

Just because one event precedes another does not make it the cause of the second event. See, Baker v. Anschutz Exploration Corp., 68 F.Supp.3d 368, 383 (W.D.N.Y. 2014)(causation opinions based solely on a "temporal relationship "is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed.R.Evid. 702).  And although expert testimony may be more inferential than that of fact witnesses, the expert's opinion must be more than conclusory.  See, Poulis-Minott v. Smith, 388 F.3d 354, 359 (1st Cir. 2004)(addressing issue). Therefore, as described in the report, the causation opinion lacks sufficient foundation to link the two events – deviation from standard of care and death – and originally led to preclusion (Docket No. 201, p. 9).  But like in MSM, the opinion presented a legitimate topic for deposition.

During the deposition, Dr. Benabe was asked why the report does not state that the decedent passed away because of injuries from the fall (Docket No. 74-4, pp. 127-128).  He responded that it was "obvious," for if there were another explanation, "they" should have written it down somewhere in the record.  Id.  Elaborating on his response, he said that "it's obvious that [the decedent] died as a consequence of all the complications in the aftermath of a subdural hematoma that required surgical intervention.  Basically, that's the reason.  He was comatose.  Most likely he had – I can't remember the autopsy, as I recall – of whether he had a cerebral edema or not."  Id. at p. 128.

An expert must testify to something more than what is "obvious" in order to be of any particular assistance to the jury.  Dhillon v. Crown Controls Corp., 269 F.3d 865, 871 (7th Cir. 2001); Kerlinsky v. Sandoz, Inc., 783 F.Supp.2d 236, 241 (D.Mass. 2011)(saying that "there 'is no other reasonable cause' for [p]laintiff's syncope, is "tantamount to no explanation at all").

Nonetheless, as part of his testimony Dr. Benabe placed his opinion in context, supplying the necessary foundation for its admissibility.

In particular, Dr. Benabe explained that when the decedent fell to the floor in BMA-Ponce's facility on June 3d, he was in a fetal position, jumping and with movements and convulsions (Docket No. 74-4, p. 105). He was bleeding in the head, with a one-inch wound and a hematoma on both sides of the top part of the head. Id. Yet he was oriented in place and person; and wanted to stand up and sit in a chair. Id. at 99-100. The emergency unit arrived, asked him some questions, which he answered, and stood up to the stretcher by himself, without help. Id. at 100, 106, 107.

However, upon arriving in the hospital shortly thereafter, the decedent's state of consciousness was very poor, almost comatose, with a Glasgow coma score of 3 (Docket No. 74-4, p. 117-118).[23] Due to respiratory failure, he was intubated. A head CT scan confirmed a subdural hematoma. He was given transfusions of packed red blood cells and fibrinogen for blood clotting, and taken to surgery the next day (June 4th) for drainage of the subdural hematoma through a craniotomy. Throughout, he remained intubated, with dilated pupils, and did not respond to pain stimuli. Id. at pp. 114-115. That day, he was hypotensive, and one day later, severely hypertensive. Id. at pp. 123-124, 126. He had two dialysis treatments, on June 4th and June 5th. But he never recovered, remaining unresponsive or comatose. Id. at 126. On June 5th he was pronounced brain dead and expired on June 6th.

For Dr. Benabe, the fall was preventable (Docket No. 74-4, p. 129). In his view, BMA-Ponce personnel failed to recognize what may have been a preventable cause for the fall

_____

[23] Dr. Benabe explained that "a normal Glasgow is usually about 15" (Docket No. 74-4, p. 118). Defendants' expert noted that on examination, the deceased was found with dilated pupils, a Glasgow 3 neurologic finding, and comatose (Docket No. 92-2, p. 10).

immediately after dialysis treatment, most likely orthostatic hypotension, which led to seizures, the fall, the subdural hematoma, and the clinical complications described above.  Id. at p. 128.  He testified that the possibilities of having a major fall leading to the traumatic subdural – and all the consequences after that, would've been much, much less had [the patient] been assisted."  Id. at 146.  Though some might argue the contrary, his responses are sufficiently precise to fill in the report's informational gap on the issue of causation.  Broadly stated, he essentially identified the standard of care (presence of a physician, adequate blood measurements, personnel taking care of patient after dialysis to prevent him from standing up, making sure blood pressure was stable); deviation (absence of physician, failure to recognize orthostatic hypotension, and personnel not assisting the patient as he stood); consequence (seizures, fall); immediate effect (subdural hematoma); attendant complications (coma, intubation, surgery); and related outcome (brain death two days after the fall, followed by passing one day later).

Proximate cause depends on "the nature and effect" of the breach of the legal duty owed. Rolón-Alvarado, 1 F.3d at 80 n.6.  To that end, plaintiff must prove that the health-care provider's breach of the standard of care was the factor that "most probably" caused plaintiff's harm.  Lama, 16 F.3d at 478.  This fact need not be established with mathematical accuracy.  Id.  Neither must all other cause of damage be eliminated.  Id.  The plaintiff instead must show that the factor "fairly contributed to the injury."  Heddinger v. Ashford Memorial Community Hosp., 734 F.2d 81, 85 (1st Cir. 1984).[24]  With this in mind, Dr. Benabe's causation opinion cannot be excluded for lack of foundation.  It is not connected to existing data only by the ipse dixit of the expert.  To the extent

---

[24] See also, Marshall v. Pérez-Arzuaga, 828 F.2d 845, 847 (1st Cir. 1987)(noting that the causation requirement in Puerto Rico limits a party's liability for hazards flowing from its negligence to those hazards that could be anticipated by a prudent person).

the factual underpinning of the opinion is weak, "it is a matter affecting the weight and credibility of the testimony- a question to be resolved by the jury." Ferrara & DiMercurio v. St. Paul Mercury Ins. Co., 240 F.3d 1, 9 (1st Cir. 2001).

    **c.  Nurse's Note**

After the decedent fell to the floor, Nurse María Ramos and her co-workers checked his vital signs and tended to the wound on the patient's head.  She wrote in a paper ("Note") information related to the fall, including the patient's vital signs and time of the fall.  The next day, she filled an Adverse Event Form.  To refresh her memory as she completed the Form, she referenced the Note.  After writing the Adverse Even Form, and reading it over, she threw the Note away (Docket No. 103, pp. 2-3).

Dr. Benabe's report does not contain any opinions regarding the Note or the fact that it was discarded (Docket No. 53-8).  Nevertheless, during the deposition he offered opinions about the Note and its significance, and why it should not have been discarded (Docket No. 74-4, pp. 168-169; 171-172).  Because the report is silent on those issues, the Initial Ruling precluded the expert from offering expert opinion about this subject at trial (Docket No. 201, pp. 2, 5, 6, 9).  In light of Lawes, ---F. 3d----, 2020 WL 3286790, however, the court must reconsider the ruling.

In Lawes, the District Court precluded the plaintiff's expert from testifying because, among other things, the expert's report did not include all his opinions or the basis and reasons for them, the expert did not submit a written supplemental report after his depositions, and he came up with a late design defect.  See, Lawes,---F.3d----, 2020 WL 3286790 at *13-*14.  The Court characterized the expert as a moving target, and so found that defendant was prejudiced as a result. Id. at 14.  The First Circuit reversed, pointing out that the focus of a preclusion inquiry is mainly upon surprise and prejudice to the defendant (id. at 13), and in the Court's view, the record

demonstrated that defendant was neither surprised nor prejudiced by the expert's testimony during a <u>Daubert</u> hearing at trial.  <u>Id.</u> at 14-15.

As for surprise, the First Circuit noted that pretrial disclosures and relevant deposition testimony gave defendant sufficient notice of the expert's negligent-design-related opinions in question.  <u>See</u>, <u>Lawes</u>, ---F.3d----, 2020 WL 3286790 at *13-*14.  It observed that the District Court did not give any effect to the expert's depositions because according to the trial court, "deposition testimony is not a 'suitable substitute' for a Rule 26(a)(2) expert report or a supplemental report under Rule 26(e)'."  <u>Id.</u> at * 15.  However, it rejected the District Court's reasoning, stating that attention to the pretrial record is necessary, and that if the party opposing sanctions provided notice of a change in its expert's testimony – even if insufficient to satisfy the duty to supplement – then the other side's claimed surprise is less credible.  <u>Id.</u>

From these parameters, the First Circuit held that the District Court should have reviewed and considered whether the expert's deposition testimony put the defendant on notice of the pertinent changes in the expert's opinions regarding the design., and that the District Court's disregard for deposition testimony amounted to a meaningful error in judgment that precipitated that Court's erroneous conclusion that the defendant was in fact surprised by the expert's testimony.  <u>See</u>, <u>Lawes</u>, ---F.3d----, 2020 WL 3286790 at *15.  This was so partly because defendant questioned the expert's opinions about the allegedly negligent design.  <u>Id.</u>  There is no suggestion that the opinion was anything but complete.  And as the First Circuit observed, there was no prejudice, given the absence of indication that the expert's disclosure violations prevented defendant from prepping its theory of the case for trial.  <u>Id.</u>[25]

---

[25] The First Circuit observed, "the [expert's] depositions clearly gave adequate heads-up about his opinions regarding [plaintiff's] path the night of his accident, as well as [defendant's] lighting and monitoring obligations."  <u>See</u>, <u>Lawes</u>,

      The First Circuit contrasted the situation in <u>Lawes</u> with other cases where exclusion was considered appropriate, referring to <u>Thibeault</u> v. <u>Square D Co.</u>, 960 F.2d 239, 246-247 (1st Cir. 1992)(affirming preclusion of expert testimony where plaintiff's "eleventh-hour" change in theory days before trial would have forced the defendant to rush its preparations); <u>Freund</u> v. <u>Fleetwood Enterprises, Inc.</u>, 956 F.2d 354, 358 (1st Cir. 1992)(holding that the trial court properly excluded plaintiff's expert testimony where substance of that testimony was not made known to defendants until the middle of trial, and had defendants known about the expert testimony sooner, they might well have decided to counter it through cross-examination or other expert testimony); <u>Santiago-Díaz</u>, 456 F.3d at 277 (affirming preclusion where plaintiff's foot-dragging in announcing her expert and providing his report deprived the defendants of the opportunity to depose him, impeach his credentials, pursue countering evidence, or generally prepare their defenses); <u>Macaulay</u>, 321 F.3d at 52 (affirming preclusion of a supplemental expert report where the late filed disclosures would have either forced the defense to trial without appropriate preparation such as targeted pretrial discovery); <u>Licciardi</u>, 140 F.3d at 363 (ordering a new trial where, given the defense expert's pretrial concession that the accident caused the plaintiff's trauma, the plaintiff had no reason to develop the sort of testimony which plaintiff would have put in had the plaintiff known before trial that defendant's expert in fact planned to contest that the accident caused the trauma). <u>See</u>, <u>Lawes</u>, ---F. 3d----, 2020 WL 3286790, *15 (listing cases and summarizing disposition).[26]

      Applying <u>Lawes</u>, the court must conclude that what led the First Circuit to set aside the District Court's preclusion ruling in that case, leads to admissibility of the expert's testimony here.

---

---F.3d----, 2020 WL 3286790 at *15 n. 37.

[26] <u>See also</u>, <u>González-Rivera</u> v. <u>Centro Médico del Turabo, Inc.</u>, 931 F.3d 23, 26-28 (1st Cir. 2019)(excluding report filed nearly a year after the court's discovery deadline, following filing of defendants' motion for summary judgment).

Sandra Cruz Vargas-Alicea, et al. v. Continental Casualty Company, et al.
Civil No. 15-1941 (PAD)
Opinion and Order
Page 30

During the deposition, the issue of the Note was brought forth by plaintiffs' own counsel (Docket No. 74-4, p. 168).  Defendants objected on relevance grounds (id.), but asked follow-up questions on the same subject matter.  Id. at 169-171.  They did not schedule a continuance or request additional information to probe the expert about these new opinions any further.  To that extent, they cannot successfully assert to have been surprised.  And because the new disclosure was made sufficiently ahead of trial to allow defendants to adequately prepare their defense and to confront the expert during trial, they cannot be said to have been prejudiced.  The record does not reflect the procedural mix that, as described in Lawes, permitted exclusion in Santiago-Díaz, 456 F.3d at 277; Macaulay, 321 F.3d at 52; Licciardi, 140 F.3d at 363; Thibeault, 960 F.3d at 246-247; and Freund, 956 F.2d at 358.  See, Lawes, ---F.3d----, 2020 WL 3286790 at *15.  Thus, based on Lawes, Dr. Benabe cannot be precluded from offering expert opinion on the Note during trial.[27]

### d.  Hospital Care

Dr. Benabe's report contains no opinions regarding the care that the deceased received in the hospital, and during the deposition he expressly stated that he was not rendering any opinions on this topic (Docket No. 74-4, p. 115).  Any opinions from him at trial on this topic would be a surprise, and prejudicial.  As stated in the Initial Ruling (Docket No. 201, pp. 2, 5, 9), he is precluded from testifying as an expert on the issue of the decedent's care in the hospital.

---

[27] While contrary to the situation in Lawes, where the excluded testimony was crucial- carrying the force of dismissal – and in the present case the expert's opinions about the Note do not reach that threshold, exclusion would not be warranted given that the focus of the preclusion inquiry is mainly on surprise and prejudice, including the opponent's ability to palliate the ill effects stemming from the late disclosure.  See, Lawes, ---F. 3d-----, 2020 WL 3286790 at *16.

# III.    CONCLUSION

In the Initial Ruling, the court observed that plaintiffs produced a report without opinions sufficient to gain access to trial; they offered no justifications for the deficiencies; and the omissions in the report are not harmless.  See, Initial Ruling (Docket No. 201, p. 7).  Having thoroughly reexamined the issue, a reassessment leads to a different conclusion as to harmlessness. Defendants deposed Dr. Benabe in connection with his report and elicited responses that reasonably filled the report's gaps as to standard of care, deviation, and causation (i.e. relation between deviation and cause of death).

Even though the report does not proffer any opinions as to the discarded note, and during the deposition Dr. Benabe offered opinion testimony on that subject, defendants could have continued the deposition to gather material to probe the expert further about that issue.  Moreover, the disclosure occurred sufficiently ahead of trial to permit defendants to be adequately prepared to defend their position at trial.

Finally, Dr. Benabe's report contains no opinions regarding the care that the deceased received in the hospital, and during the deposition he expressly stated that he was not rendering on this subject.  As a result, he cannot shift course at trial and offer opinions he did not proffer during discovery.  For the reasons stated, plaintiffs' "Motion for Partial Reconsideration of DKT. 201" (Docket No. 219) is GRANTED IN PART.

**SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of June 2020.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
U.S. DISTRICT JUDGE